

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-17-00189-CV

IN THE GUARDIANSHIP OF A.E.,
AN INCAPACITATED PERSON

----------

### FROM PROBATE COURT NO. 2 OF TARRANT COUNTY
### TRIAL COURT NO. 2016-GD00368-2

----------

## OPINION

----------

This is an appeal from the denial of an uncontested guardianship application. In nine issues, Appellants H.E. and P.E. challenge the probate court's denial of their application to be appointed guardians of the person of their intellectually-disabled adult daughter, A.E. Because we hold the probate court abused its discretion in denying the guardianship, we reverse and remand.

## BACKGROUND

A.E. has a moderate intellectual disability and moderate encephalopathies. She has an IQ between 50 and 55, and she lives with her mother, H.E., and her father, P.E. Shortly before her eighteenth birthday, A.E.'s parents filed an application for guardianship of her person. *See* Tex. Est. Code Ann. § 1103.001 (West 2014) (providing that a person may file an application for a minor who, because of an incapacity, will require a guardianship after the proposed ward is no longer a minor). A.E. turned eighteen two weeks before the hearing on the application.

The guardianship was not contested by A.E.'s court-appointed attorney ad litem. At the hearing, A.E.'s parents testified about the need for a guardianship and introduced a certificate of medical examination from A.E.'s treating physician stating that she may decline to treat A.E. in the future due to A.E.'s inability to give informed consent. The court investigator testified that she did not believe a guardianship was necessary because supports and services and alternatives to guardianship were sufficient, but she conceded that she would change her mind on that point if A.E.'s doctor refused to treat A.E.

At the conclusion of the hearing, the probate court denied the guardianship application, finding that A.E.'s parents had not shown by clear and convincing evidence that supports and services and alternatives to guardianship were not feasible. The probate court subsequently filed findings of fact and conclusions of law, including findings that A.E. had not experienced any problems in receiving

2

medical treatment since becoming an adult (that is, in the two weeks between her eighteenth birthday and the hearing) and that A.E. is agreeable to allowing her parents to assist her in making medical treatment decisions. The probate court further concluded that it is not in A.E.'s best interest to take away her rights and appoint a guardian; that A.E.'s rights do not need to be protected by the appointment of a guardian; and that all of A.E.'s needs are being met.

Parents, H.E. and P.E., now appeal.

## STANDARD OF REVIEW

We review a probate court's guardianship determinations for an abuse of discretion. *In re Guardianship of Alabraba*, 341 S.W.3d 577, 579 (Tex. App.—Amarillo 2011, no pet.); *In re Guardianship of Parker*, No. 2-06-217-CV, 2007 WL 4216255, at *4 (Tex. App.—Fort Worth Nov. 29, 2007, no pet.) (mem. op.). A trial court abuses its discretion if the court acts without reference to any guiding rules or principles, that is, if the act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). A trial court also abuses its discretion by ruling without supporting evidence. *Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 578 (Tex. 2012). But an abuse of discretion does not occur when the trial court bases its decision on conflicting evidence and some evidence of substantive and probative character supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002) (op. on reh'g).

3

In guardianship proceedings, legal and factual sufficiency are not independent, reversible grounds of error but are factors to consider in assessing whether the trial court abused its discretion. *In re Guardianship of Erickson*, 208 S.W.3d 737, 743 (Tex. App.—Texarkana 2006, no pet.); *see In re J.P.C.*, 261 S.W.3d 334, 336 (Tex. App.—Fort Worth 2008, no pet.) (noting that in appropriate cases, legal and factual sufficiency are relevant factors in assessing whether the trial court abused its discretion). "We view the evidence in the light most favorable to the probate court's decision, and an abuse of discretion does not occur when the court's decision is based on conflicting evidence." *In re Guardianship of Laroe*, No. 05-15-01006-CV, 2017 WL 511156, at *5 (Tex. App.—Dallas Feb. 8, 2017, pet. denied) (mem. op.).

## DISCUSSION

H.E. and P.E. argue that the probate court abused its discretion by: (1) not finding that A.E. is totally incapacitated; (2) not finding it is in A.E.'s best interest to have H.E. and P.E. appointed as her guardians of the person; (3) not finding that A.E.'s rights or property will be protected by the appointment of a guardian; (4) not finding that alternatives to guardianship are infeasible; (5) not finding that supports and services available to A.E. are infeasible; (6) not finding that H.E. and P.E. are eligible to act as guardians and are entitled to be appointed; (7) not finding that there is evidence of A.E.'s incapacity by recurring acts or occurrences in the preceding six months that are not isolated instances of negligence or bad judgment; (8) creating a new standard as to whether there is a

4

necessity for a guardianship; and (9) denying the guardianship application when it met all of the factual and legal requirements and was not otherwise contested. We discuss the evidence and the law relating to these issues together.

## I.      Findings Required Before Appointment of a Guardian

"When interpreting a statute, we look first and foremost to its text." *United States v. Alvarez-Sanchez*, 511 U.S. 350, 356, 114 S. Ct. 1599, 1603 (1994) (Thomas, J.). Under the Estates Code, the probate court could not appoint a guardian of the person for A.E. unless the court found by clear and convincing evidence that:

(A) [A.E.] is an incapacitated person;

(B) it is in [A.E.'s] best interest to have the court appoint a person as [her] guardian;

(C) [A.E.'s] rights . . . will be protected by the appointment of a guardian;

(D) alternatives to guardianship that would avoid the need for the appointment of a guardian have been considered and determined not to be feasible; and

(E) supports and services available to [A.E.] that would avoid the need for the appointment of a guardian have been considered and determined not to be feasible.

*See* Tex. Est. Code Ann. § 1101.101(a)(1) (West Supp. 2017).[1]

---

[1]Before a 2015 legislative amendment, this section did not require a court to make the findings in (D) and (E) before appointing a guardian. *See* Act of May 18, 2015, 84th Leg., R.S., ch. 214, § 8, 2015 Tex. Sess. Law Serv. 1290, 1293–94. The number of guardianship cases had risen significantly, and the bill authors intended for the new subsections to ensure that the guardianship system is not overburdened. Senate Research Center, Bill Analysis, Tex. H.B. 39, 84th Leg., R.S. (2015).

The probate court would be further required to find by a preponderance of the evidence that A.E.'s parents are eligible for and entitled to the appointment and that A.E. either (i) is totally without capacity to care for herself and to manage her property, or (ii) lacks the capacity to do some, but not all, of the tasks necessary to care for herself or to manage her property. *See id.* § 1101.101(a)(2)(B), (D).[2] Any determination of A.E.'s incapacity would have to be "evidenced by recurring acts or occurrences in the preceding six months and not by isolated instances of negligence or bad judgment." *See id.* § 1101.102 (West 2014).

## II. The Evidence Before the Probate Court

H.E. and P.E.'s evidence included their own testimony, a certificate of medical examination and affidavit from A.E.'s treating physician, and the court investigator's testimony. The probate court also had before it the court investigator's report and a brief report from A.E.'s attorney ad litem.

### A. Testimony of A.E.'s Parents

A.E.'s mother, H.E., testified that A.E.'s intellectual disability is one that will not change. A.E. has a tendency to agree with whatever is said to her yet would not necessarily understand what was being asked of her or the significance of saying yes to a question. H.E. stated that A.E. is not capable of making medical

---

[2]H.E. and P.E. were also required to show by a preponderance of the evidence that the probate court has venue of the case. *See* Tex. Est. Code Ann. § 1101.101(a)(2)(A). The probate court found that it had venue.

decisions even with help, A.E. does not have the capacity to execute a power of attorney or supported decision-making agreement, and A.E. would not understand such a document even if it were explained to her.  Also, A.E. would not be able to understand a consent form given to her by a doctor.

H.E. further testified that A.E.'s school has a program for special needs children, that she can empty the dishwasher, and that she is learning to fold towels at a volunteer job.  At her volunteer job, A.E. also takes chairs off tables at a restaurant and sets out salt and pepper containers on the tables.  If her clothes are laid out for her, she can partially dress herself.  A.E. had not yet been denied medical treatment, but she had not been to the doctor in the two weeks since she had turned eighteen.  P.E., A.E.'s father, testified that he agreed with all of his wife's testimony.

## B.    Testimony and Documentary Evidence from A.E.'s Physician

If an application for guardianship is based on a proposed ward's alleged incapacity, the applicant must provide the court with a letter or certification that (1) complies with Estates Code section 1101.103 and (2) shows that a physician or psychologist has examined the proposed ward.  *Id.* § 1101.104 (West Supp. 2017).  Section 1101.103 provides that the letter or certification must include a description of the nature, degree, and severity of the proposed ward's incapacity and be provided by a Texas-licensed physician who has examined the proposed ward no more than 120 days before the date of the application's filing.  *Id.*

7

§ 1101.103 (West 2014) (specifying certain functions and abilities of the proposed ward that the letter or certificate must address).

A.E.'s treating physician provided the required doctor's certificate, which A.E.'s parents produced at the hearing. In the certificate, A.E.'s doctor stated that A.E. has moderate encephalopathies and a moderate intellectual disability, with no possibility for improvement. According to her doctor, A.E. is unable to initiate and make responsible decisions regarding:

- complex business, managerial, or financial decisions;

- a personal bank account;

- safely operating a motor vehicle;

- voting in a public election;

- determining her own residence;

- administering her own medication;

- attending to basic activities of daily living without supports and services;

- marriage;

- attending to instrumental activities of daily living (like shopping, cooking, and cleaning); and

- consenting to medical, dental, or psychological treatment.

The doctor indicated that A.E. would not be able to understand the guardianship hearing. While the doctor found that, with supports and services, A.E. can make responsible decisions about basic daily activities like bathing, grooming, dressing, walking, and toileting, she further stated that she believed A.E. is

8

unable to handle making any other decisions.  The doctor concluded that A.E. is totally incapacitated.  The least restrictive placement the doctor considered appropriate for A.E. is with A.E.'s family.[3]

In a separate affidavit, the doctor stated that, in her medical opinion, A.E. is totally incapacitated.  She further swore to her belief[4] that A.E. is unable to adequately handle any decisions for herself even with assistance and that A.E. does not have the capacity to execute a power of attorney or a supported decision-making agreement.  *See Decker v. Decker*, 192 S.W.3d 648, 652 (Tex. App.—Fort Worth 2006, no pet.) ("The term 'mental capacity' means that the grantor at the time of the execution of the [instrument] must have had sufficient mind and memory to understand the nature and effect of his act.").  Finally, A.E.'s

---

[3]The doctor used a Physician's Certificate of Medical Examination form available on the probate court's website.  The doctor indicated her opinion about placement by checking from the following list of options:  "Nursing home level of care," "Assisted Living Facility," "Group Home," "Memory care unit," "Own Home or with family," and "Other." [Capitalization in original.]  *See* https://access.tarrantcounty.com/content/dam/main/probate-courts/probate-court-1/Documents/CME.pdf (last visited June 11, 2018).

[4]The doctor began a number of the assertions in her affidavit based on a stated belief about A.E.'s capacity.  She did not state that these beliefs were based on her medical expertise.  However, to the extent her statements needed to be based on reasonable medical probability, from the context of the statements, they were her opinions derived from her examinations and treatment of A.E.  *See Stodghill v. Tex. Emp. Ins. Ass'n*, 582 S.W.2d 102, 105 (Tex. 1979) (stating that a medical expert need not use the exact magic words "reasonable medical probability").  In any event, A.E.'s attorney ad litem did not object to the affidavit.

9

doctor swore that she may withhold treatment from A.E. because A.E. cannot provide informed consent and has no legal guardian to consent on her behalf.

## C. The Court Investigator's Initial Report

In the court investigator's initial report, admitted as evidence at the hearing, the investigator noted that:

- H.E. reported that A.E. reads and writes at a first-grade level, has limited fine motor skills, and functions socially like a ten- or twelve-year-old;

- A.E.'s conversation was limited and difficult to understand;

- A.E. used a phone app to help communicate using pictures;

- A.E. can use her smart phone to text her mother and send her pictures;

- A.E. can follow three-step directions;

- A.E.'s "[l]anguage/speech impediment and fine motor skills create [a] barrier to further independence";

- A.E. could not name her medications and did not know who her physician was;

- A.E. could, with the assistance of her parents, make decisions regarding her residence, voting, operating a motor vehicle, and marriage;

- Alternatives to guardianship for A.E. included having a representative payee for public benefits; a joint bank account; a special needs trust; "alternative forms of decision making based on person-centered planning"; and having a surrogate decision-maker as described in Health and Safety Code section 166.039, Tex. Health & Safety Code Ann. § 166.039 (West 2017); and

- Alternatives to guardianship for A.E. did not include a medical power of attorney, a durable power of attorney, or a declaration for mental health treatment under Civil Practice and Remedies Code chapter 137, Tex. Civ. Prac. & Rem. Code Ann. § 137.002 (West 2011)

10

(providing that an adult who is not incapacitated may execute a declaration for mental health treatment).

As for the need for a guardianship, the investigator stated in the report that A.E. is incapacitated and does not understand the concept of guardianship. Nevertheless, the investigator concluded in the report that supports and services were sufficient and that alternatives to guardianship were feasible, and the investigator recommended that A.E. did not need a guardian.

## D. The Court Investigator's Testimony

At the hearing, the court investigator testified that despite A.E.'s doctor's statement that A.E. cannot handle decisions even with assistance, she believed A.E. could make decisions with her parents' support; "[s]he lives at home with her parents who assist her with decision-making and with that assistance, she's able to function and make decisions in her life." The investigator acknowledged, however, that A.E. does not understand the consequences of her decisions and does not have the capacity to sign a power of attorney.

The investigator further acknowledged that A.E. cannot provide informed consent to a doctor. When asked how A.E. could get treatment from a doctor without a guardian or the ability to consent to treatment, the investigator stated, "[t]hat would be between the doctor and the family and [A.E.]." The investigator agreed, however, that in light of A.E.'s doctor's statement that she may withhold treatment from A.E., a guardianship would probably be necessary "if the doctor would not be able to see her with her parents accompanying her."

11

The investigator answered "possibly" when asked if someone with a tendency to answer "yes" to please people could be subject to abuse or exploitation, given that her parents were not with her all the time. The investigator asked A.E. questions when they met but testified that she did not believe A.E. understood the questions. The investigator believed that A.E. would not be able to give an opinion about her care situation, about voting, or about her ability to get married. Although the investigator stated in her report that A.E. could make decisions about voting, driving, and marriage with her parents' support and assistance, she testified at trial that she did not believe A.E. would understand how to make those decisions and essentially acknowledged that A.E.'s parents would be making those decisions for her.

The investigator explained why she believed that supports and services were sufficient and that alternatives to guardianship were feasible. She testified,

> Because when I met with the family, we talked about what kind of problems they were running into. She's only been 18 for two weeks and there weren't any problems that they had run into the day I was out there and met with them.

> And so there was nothing I could indicate was a reason that they needed to be the legal guardian. As her parents, they were able to take care of getting her to the doctor, they provide food clothing and shelter, they're interacting with the school. She has one more year of high school.

> I just didn't see anything currently that would require guardianship. And considering that it's a last resort, I just didn't see that at this time it was necessary.

In other words, the investigator based her recommendation against guardianship on the fact that in the two weeks since A.E. had turned eighteen, her parents had not yet encountered a problem with getting her medical treatment or protecting her rights, rather than on any foreseeable difficulties they could face in the future. On redirect examination, the investigator testified that "[w]e're looking to see if there's something that parents haven't been able to achieve or accomplish for the person that's living with them, their young adult child, before a guardianship is necessary," and "[i]f the doctor has, since I've met with the family, said that [she] would no longer treat [A.E.], then that[]—would be something to be considered." Importantly, the investigator later stated that if A.E. would not be able to see her doctor, she would conclude that supports and services were not feasible and that a guardianship would be necessary.

### E. A.E.'s Unsworn Statements and the Ad Litem's Report

A.E.'s attorney ad litem stated in her report filed in the probate court that "it does not appear that there are any less restrictive means that would better suit this situation," and "[a] full guardianship is necessary and [A.E.] is amenable to that continued care."

The attorney ad litem called A.E. to answer some questions, but A.E. was not sworn, nor was any attempt made to determine whether A.E. had the capacity to understand the oath of a witness.[5] However, the attorney ad litem

---

[5]The court is somewhat concerned that no attempt was made to determine whether A.E. had the capacity to be sworn and to give testimony before she was

13

called A.E. so that, in lieu of giving her report at the hearing, she could "show the Court that, you know, [A.E.] has really pretty minimal understanding of the concept of guardianship as a whole."  The attorney ad litem asked A.E. if her parents helped her a lot, to which she shook her head in what appeared to be a "yes" motion.  She gave the same response to all of the questions asked of her, including if she remembered talking to the attorney ad litem about driving a car, if she thought she would be able to drive a car, if she needed a lot of help, if she would like to vote in an election, and if she liked her doctor and would be sad if she had to go to a different doctor.  The attorney ad litem informed the court that she did not oppose the guardianship because, while A.E. did not understand guardianships, A.E. "was able to tell [the attorney ad litem] that she thinks she likes the help, she wants the help to continue."

---

subjected to questioning.  The common law has long recognized that "testimony" in the context of a legal proceeding is fundamentally defined as "a statement made by a witness under oath."  *Cauble v. Key*, 256 S.W. 654, 655 (Tex. Civ. App.—Austin 1923, no writ) (citation omitted).  Moreover, "the administration of the oath by a competent officer is a fundamental and essential requirement to give testimony its binding force," and the Texas Constitution "clearly implies that such is a prerequisite to the giving of evidence."  *Id.* (citing Texas Const. art. 1, § 5).  However, any error associated with the failure to swear A.E. as a witness is waived by the failure of any party to object at the guardianship hearing.  *See Trammel v. Mount*, 4 S.W. 377, 379 (Tex. 1887) ("The appellants allowed the witness to give his testimony without being sworn, and thereby waived any objections to it on that account.").

14

**III. Clear and Convincing Evidence Demonstrated that the Guardianship is Necessary.**

**A. The Evidence Showed that A.E. is Totally Incapacitated, and No Evidence Supported a Contrary Finding.**

The probate court found that A.E. is incapacitated as defined in the Estates Code. Tex. Est. Code Ann. § 1002.017 (West 2014). H.E. and P.E. argue in their first issue, however, that the probate court abused its discretion by failing to find that A.E. is *totally* incapacitated. *See id.* § 1101.101(a)(2)(D). Relatedly, in their seventh issue, they argue that the probate court abused its discretion in not finding that there is clear and convincing evidence of A.E.'s incapacity by recurring acts or occurrences in the preceding six months that are not isolated instances of negligence or bad judgment. *See id.* § 1101.102.

Because the probate court found that A.E. is incapacitated, the court therefore impliedly found that A.E. "is substantially unable to: (A) provide food, clothing, or shelter for . . . herself; (B) care for [her] own physical health; or (C) manage [her] own financial affairs." *Id.* § 1002.017. The probate court did not, however, make the express findings that would have been required by the Estates Code before appointing a guardian regarding whether A.E. lacks the capacity to do some, but not all, of the tasks necessary to care for herself or to manage her property, or whether she is totally without capacity to care for herself and her property. *Id.* § 1101.101. Despite the absence of any express findings regarding total incapacity, all of the evidence at the hearing proved that A.E. has no capacity to care for herself or her property.

*First*, A.E.'s treating physician's certificate and affidavit provided evidence that A.E. is totally incapacitated. A.E. does not have the capacity to understand the nature or consequences of her actions and is unable to provide food, clothing, or shelter for herself; care for her own physical health; or manage her own financial affairs. She cannot attend to instrumental activities of daily living like shopping, cooking, traveling, or cleaning. A.E. cannot consent to medical treatment. She cannot make decisions regarding voting, determining her own residence, or marriage. She does not know what medications she takes. A.E. has a deficit in understanding and communicating; solving problems; reasoning logically; grasping abstract aspects of her situation; interpreting idiomatic expressions or proverbs; and breaking down complex tasks into simple steps and carrying them out. Further, A.E.'s impairment with respect to these deficits does not vary substantially in frequency, severity, or duration.

*Second*, A.E.'s parents testified that A.E. has a tendency to agree with whatever is said to her without understanding what she is being asked.[6]

---

[6]In the probate court's findings of fact, the court found that when questioned at the hearing, A.E. indicated a "yes" answer when she agreed with the questions by moving her head up and down and that she "did not move her head up and down when she disagreed with the questions to communicate 'no' and there is silence on the record ('nonverbal response') to these questions or a statement on the record that she was moving her head, but not in a particular direction." But this finding is not supported by the record. The record indicates that A.E. answered "yes" with a head shake to all questions posed to her. (For one question—"Do you like the doctor you have right now?"—the record indicates she gave a nonverbal response. Nothing in the record indicates A.E. intended this as a "no"; all her responses were nonverbal. And to a clarifying follow-up question ("Would you be sad if you had to go to a different doctor? Do

16

*Third*, the court investigator testified that she believed that A.E. could make decisions with her parents' support, yet she acknowledged that A.E. does not understand the consequences of her decisions and does not have the capacity to sign a power of attorney and that her parents would more or less have to make decisions for her. The investigator's report indicated that A.E. does not know who her doctor is or what medications she takes and did not understand the questions the investigator asked her. The investigator recognized that A.E. would not be able to give an opinion about her care situation, about voting, or about her ability to get married and would not understand how to make those decisions.

In summary, the uncontradicted evidence at the hearing—more than clear and convincing, and certainly more than a preponderance, which is all the statute requires—established that A.E. is totally without capacity to care for herself and to manage her property. *See id.* § 1101.101(a)(2)(D). Indeed, no evidence supported a contrary determination. As a result, the probate court abused its discretion by not making such a finding. *See id.* Further, the evidence of incapacity at trial was of "recurring acts or occurrences in the preceding six months and not . . . isolated instances of negligence or bad judgment"— specifically, undisputed clear and convincing evidence showed that A.E.'s

---

you want to stay with the same doctor?"), she gave a "yes" response like she had to all the previous questions.)

17

incapacity is the result of encephalopathies and a permanent intellectual disability.  *See id.* § 1101.102.

We sustain H.E. and P.E.'s first and seventh issues.

**B.**     **The Evidence Showed that Supports and Services Are Not Sufficient for A.E, and No Evidence Supported a Contrary Finding.**

**1.     A.E. Cannot Make Personal Decisions, Even with Assistance.**

In their fifth issue, H.E. and P.E. assert that the probate court abused its discretion by not finding that supports and services available to A.E. that would avoid the need for a guardian of the person had been considered and determined not to be feasible.  *See id.* § 1101.102(a)(1)(E).  We agree.

"Supports and services" is defined in the Estates Code to mean:

available formal and informal resources and assistance that enable an individual to:

(1) meet the individual's needs for food, clothing, or shelter;

(2) care for the individual's physical or mental health;

(3) manage the individual's financial affairs; or

(4) make personal decisions regarding residence, voting, operating a motor vehicle, and marriage.

*Id.* § 1002.031 (West Supp. 2017).  Importantly, under this definition, the Texas Legislature did not include resources and assistance that enable another person to make personal decisions *for* the individual regarding residence, voting, operating a motor vehicle, and marriage; to manage the individual's financial affairs; to care for the individual's physical and mental health; or to meet the

18

individual's needs for food, clothing, or shelter. *See id.*; *cf. Evans v. Jordan*, 8 F. Cas. 872, 873 (C.C. Va. 1813) (Marshall, J.), *aff'd*, 13 U.S. (9 Cranch) 199 (1815) ("[In the legislative branch] is confided, without revision, the power of deciding on the justice as well as wisdom of measures relative to subjects on which they have the constitutional power to act. Wherever, then, their language admits of no doubt, their plain and obvious intent must prevail.").

All the evidence at the hearing established that no amount of resources would enable A.E. to meet her own needs for food, clothing, or shelter; care for her physical or mental health; manage her financial affairs; or make personal decisions regarding residence, voting, operating a motor vehicle, and marriage. *See* Tex. Est. Code Ann. § 1002.031. As previously noted, the doctor's certificate stated that A.E. is unable to make responsible decisions regarding a bank account, driving, voting, determining her own residence, marriage, administering her medication, attending to most of her daily living activities, or consenting to treatment. The doctor stated in her affidavit that she believed A.E. could not adequately handle any decisions by herself, even with assistance. A.E.'s parents testified that she would not necessarily understand questions asked of her or the significance of answering yes to a question but that she nevertheless tends to answer yes to questions.

The court investigator further buttressed the parents' testimony when she testified that she did not ask A.E. if she liked getting help from her parents because A.E. "really couldn't answer that question, I didn't feel like." The

19

investigator testified that A.E. did not understand the questions the investigator asked her and could not give an opinion about her preference for her care and that A.E. would not be able to give an opinion about the matters addressed by supports and services and would not understand how to make those decisions.[7]

The clear and convincing evidence at the hearing established as a matter of law that resources would not enable A.E. to meet her needs, care for her health, manage her finances, or make the personal decisions prioritized by the Estates Code. Her needs and health must be managed *for her* because she cannot understand her options to make those decisions for herself, even when they are explained to her. There was simply no evidence to the contrary at the hearing. Likewise, A.E. cannot understand the options for, or the consequences of, decisions regarding important personal matters like marriage, voting, and choosing her place of residence, and there was no evidence to the contrary. There is no question from the evidence that she cannot drive.

---

[7]In an amicus brief, Cook Children's Health Care System points out the flaw in the probate court's findings regarding A.E.'s capacity to make decisions related to her healthcare. Despite the probate court's finding that A.E. "is agreeable to allowing her parents to assist her in making medical treatment decisions," A.E. does not have the requisite mental capacity to consent to allowing her parents to assist, and "[t]hat is the point of, and need for, the appointment of a guardian." Moreover, the court investigator agreed that A.E. cannot give informed consent. We agree with Cook Children's that A.E. must rely on someone "to make medical decisions for her, not just someone to 'assist' her in making a decision she cannot make in the first place."

## 2. The Availability of Medicaid Waivers for A.E. Does Not Obviate the Need for a Guardianship.

Amicus Disability Rights Texas asserts in its brief that Texas has Medicaid waivers for services for persons with intellectual and developmental disabilities and for community living assistance and support services, and it contends that these are examples of supports and services available to A.E. *See* 40 Tex. Admin. Code §§ 9.154(a) (Tex. Dep't of Aging & Disability Servs., Intellectual Disability Servs.—Medicaid State Operating Agency Responsibilities), 45.104(a) (Tex. Dep't of Aging & Disability Servs., Comty. Living Assistance & Support Servs. & Comty. First Choice (CFC) Servs.). The programs referenced by Disability Rights Texas are Medicaid-waiver programs operated by Texas Health and Human Services[8] that provide community-based services and supports to eligible individuals. *Id.* §§ 9.154(a), 45.104(a). These programs are regulated under Title 40, Part 1 of the Administrative Code (Dep't of Aging & Disability Servs., Social Servs. & Assistance).

The home and community-based services programs under chapter 9 of Title 40, Part 1 supplement rather than replace an individual's "natural supports and other community services for which the individual may be available." *Id.* § 9.154(c). The regulations for programs under chapter 9 call for the programs to "encourage the individual, the individual's LAR [legally authorized

---

[8]These services were formerly provided by the Department of Aging and Disability Services.

21

representative], and family members, *with the consent of the individual* or the individual's LAR, to participate in making choices about where the individual will live, attend school, work, and take part in leisure activities." *Id.* § 9.172 (emphasis added). But as an adult without a guardian, A.E. does not have an LAR,[9] and she does not have the capacity to consent on her own. The program's existence does not change the fact that A.E.'s parents would have to make most decisions for her.

Similarly, if an individual wants to enroll in a program under the "community living assistance and support services" program in chapter 45, a case manager from the program provider must, among other things, "obtain the signature of the individual or LAR on a Verification of Freedom of Choice form designating the individual's choice for enrollment." *Id.* § 45.212. Again, A.E. has no LAR and does not have the capacity to make an informed choice, much less the capacity to sign a document to indicate that choice. Further, the individual, or an LAR on behalf of the individual, must comply with certain requirements, including completing Medicaid paperwork and reviewing and agreeing to an individual plan of care, which A.E. cannot do and cannot understand if explained to her. *See id.* §§ 45.103(57), 45.302. These services do not obviate the need for a guardianship.

---

[9]The regulations define an LAR as "[a] person authorized by law to act on behalf of a person with regard to a matter described in this subchapter, and may include a parent, guardian, or managing conservator of a minor, or the guardian of an adult." 40 Tex. Admin. Code § 9.153(51), 45.103(61).

Accordingly, the probate court abused its discretion in finding that "[t]here is evidence that supports and services . . . available to [A.E.] that would avoid the need for a guardianship are feasible and would enable [A.E.] to make personal decisions regarding residence, voting, operating a motor vehicle . . . and marriage" and in refusing to find that supports and services have been considered and are not feasible because clear and convincing evidence establishes the contrary as a matter of law and no evidence supports the probate court's findings. *See* Tex. Est. Code Ann. § 1002.031, 1101.101(a)(1)(E). We sustain H.E. and P.E.'s fifth issue.

**C.** **The Evidence Showed that Alternatives to Guardianship are Not Feasible, and No Evidence Supported a Contrary Finding.**

In their fourth issue, H.E. and P.E. argue that the probate court abused its discretion by not finding that alternatives to guardianship that would avoid the need for the appointment of a guardian have been considered and determined not to be feasible. *See id.* § 1101.101(a)(1)(D). We agree. Clear and convincing evidence at the hearing established that alternatives to guardianship are not feasible for A.E.

**1.** **Statutory Alternatives to Guardianship**

The Estates Code defines "alternatives to guardianship" to include the following:

> (1) execution of a medical power of attorney under Chapter 166, Health and Safety Code;

23

(2) appointment of an attorney in fact or agent under a durable power of attorney as provided by Subtitle P, Title 2;

(3) execution of a declaration for mental health treatment under Chapter 137, Civil Practice and Remedies Code;

(4) appointment of a representative payee to manage public benefits;

(5) establishment of a joint bank account;

(6) creation of a management trust under Chapter 1301;

(7) creation of a special needs trust;

(8) designation of a guardian before the need arises under Subchapter E, Chapter 1104; and

(9) establishment of alternate forms of decision-making based on person-centered planning.

Tex. Est. Code Ann. § 1002.0015 (West Supp. 2017); *see id.* §§ 1301.053–.054 (West 2014 & Supp. 2017); Tex. Health & Safety Code Ann. § 166.039. A.E.'s parents do not seek appointment as guardians of A.E.'s estate, and the options in (4), (5), (6), and (7) do not address A.E.'s needs for a guardian of the person.

The Estates Code does not define "person-centered planning" for purposes of guardianships.[10] However, the code provides for "supported decision-making," defined as

---

[10]There is no single definition of "person-centered planning" used among experts in the field. A. Frank Johns, *Person-Centered Planning in Guardianship: A Little Hope for the Future*, 2012 Utah L. Rev. 1541, 1547 (2012). "[I]t is described more as a spectrum of processes based on one general philosophical background." *Id.* at 1547–48. "From this spectrum of processes comes a general understanding of just how person-centered philosophy is applied. While

24

> a process of supporting and accommodating an adult with a disability to enable the adult to make life decisions, including decisions related to where the adult wants to live, the services, supports, and medical care the adult wants to receive, whom the adult wants to live with, and where the adult wants to work, *without impeding the self-determination of the adult.*

Tex. Est. Code Ann. § 1357.002 (West Supp. 2017) (emphasis added). In line with that definition, as an alternative to guardianship, an adult with a disability may enter into a supported-decision making agreement with a "supporter" under which the supporter agrees to do some or all the following:

> (1) provide supported decision-making, including assistance in understanding the options, responsibilities, and consequences of the adult's life decisions, *without making those decisions on behalf of the adult with a disability*;
>
> (2) subject to Section 1357.054, assist the adult in accessing, collecting, and obtaining information that is relevant to a given life decision, including medical, psychological, financial, educational, or treatment records, from any person;
>
> (3) assist the adult with a disability *in understanding the information* described by Subdivision (2); and
>
> (4) assist the adult in communicating *the adult's decisions* to appropriate persons.

*Id.* §§ 1357.002–.003, 1357.051 (West Supp. 2017) (emphasis added). The agreement must be signed voluntarily, without coercion or undue influence. *Id.* § 1357.055 (West Supp. 2017). The purpose of the chapter establishing

---

traditional guardianship is system-driven, person-centered philosophy is a person-directed process where the *individual* identifies what is important. It is a philosophy that applies the principle of self-determination." *Id.* at 1548 (emphasis added). "The key elements of person-centered planning include person-directed preferences and establishing a vision based on the person's abilities, and strengths, which are determined from informal and formal knowledge." *Id.*

25

supported decision-making agreements "is to recognize a less restrictive alternative to guardianship for adults with disabilities who need assistance with decisions regarding daily living but *who are not considered incapacitated persons* for purposes of establishing a guardianship." *Id.* § 1357.003 (emphasis added).

As another guardianship alternative, chapter 166 of the Health and Safety Code, the Advance Directives Act, governs medical directives, out-of-hospital do-not-resuscitate orders, and medical powers of attorney. Tex. Health & Safety Code Ann. §§ 166.001, 166.002 (West 2017). Under section 166.039 of that chapter, if an adult "qualified patient"—"a patient with a terminal or irreversible condition that has been diagnosed and certified in writing by the attending physician"—is incompetent or is mentally or physically incapable of communication, then treatment decisions for the patient can be made by the patient's legal guardian, agent under a medical power of attorney, or parents (if the patient has no legal guardian or agent), based on knowledge of what the patient would desire. *Id.* §§ 166.031, 166.039(a), (b), (c) (West 2017). For purposes of the chapter, the phrase "irreversible condition" means a condition, injury, or illness that, among other elements, is fatal. *Id.* § 166.002(9).

While not listed in the Estates Code as an alternative to guardianship, Health and Safety Code chapter 313, the Consent to Medical Treatment Act, is another statutory provision that allows a person to consent to the medical treatment of another. *Id.* § 313.001 (West 2017). The chapter allows certain specified persons to consent to medical treatment on behalf of a patient when the

26

patient is an adult who is (1) mentally or physically incapable of communication *and* (2) a patient in a home and community support services agency, a hospital, or a nursing home, or is an inmate of a county or municipal jail. *Id.* § 313.004 (West Supp. 2017). The chapter does not apply to consent for emergency medical treatment, which is covered in chapter 773 of that code. *Id.* § 313.003(4) (West Supp. 2017). No party disputes that A.E. would be able to receive emergency medical care, regardless of her ability to consent.

### 2. None of the Alternatives Avoid the Need for Guardianship.

H.E. testified that even if explained to her, her daughter A.E. could not understand the contents of a power of attorney, a supported decision-making agreement, or any kind of a legal document, and A.E. does not have the capacity to execute these types of documents. H.E. further stated that A.E. is not capable of making her own medical decisions even with her parents' help, could not give informed consent, and would not understand the contents of a written consent form. A.E. does not know what medications she takes or how to take them. In addition, the court investigator recognized that A.E. would not be able to give an opinion on or make a decision about her care situation, about voting, or about her ability to get married; that A.E. does not understand the consequences of her decisions; that she does not have the capacity to sign a power of attorney; and that she cannot give informed consent to a doctor. A.E.'s doctor also gave evidence that A.E. cannot understand the consequences of her actions, cannot

consent to medical treatment, and has a deficit in understanding and communicating.

Clear and convincing evidence established that A.E. is incapacitated and cannot execute a declaration for mental health treatment under Civil Practice and Remedies Code section 137.002. *See* Tex. Civ. Prac. & Rem. Code Ann. § 137.002. The provision in Health and Safety Code section 166.039 that allows a parent to consent to medical treatment for an adult incompetent child is also inapplicable to A.E. because she does not have a condition that, if left without life-sustaining treatment, is fatal; thus, she is not a "qualified patient" under that section. *See* Tex. Health & Safety Code Ann. §§ 166.031, 166.039.

A.E. is not competent and therefore cannot execute a written directive for medical treatment under Health and Safety Code chapter 166. *See id.* § 166.032(a) (West 2017). The probate court found that Health and Safety Code chapter 313 was an alternative to guardianship, but that chapter likewise does not apply to A.E. because she lives at home and has not been hospitalized. *See id.* § 313.004 (applying only to an adult patient in a home and community support services agency, a hospital, a nursing home, or jail). Nor, as discussed herein, does A.E. have the capacity to consent to hospitalization for non-emergency treatment. While the parties do not dispute that A.E. can receive emergency medical treatment, the evidence establishes as a matter of law that she has no way of providing informed consent to receive non-emergency medical treatment.

28

Accordingly, without a guardianship, the evidence demonstrated, without contravention, that A.E. cannot receive non-emergency medical treatment.[11]

Further, the uncontroverted evidence established as a matter of law that A.E. is not capable of applying for government services or benefits; enrolling herself in educational or vocational services; or understanding the terms of a lease or other agreement to establish a residence. The uncontroverted evidence also established that A.E. cannot have an agent take such actions on her behalf under a power of attorney because she does not have the capacity to execute such an instrument. *See In re Estate of Vackar*, 345 S.W.3d 588, 597 (Tex. App.—San Antonio 2011, no pet.) (noting a person lacks mental capacity to execute a power of attorney if the person does not understand the nature or consequences of executing the instrument). A.E. cannot manage any part of her physical or mental health; cannot make personal decisions on important matters such as voting, determining her residence, or marriage; and cannot handle basic

---

[11]Additionally, though not raised as an issue in the probate court proceedings, as Amicus Cook Children's points out, by federal and state law, a doctor generally must keep patient records and communications confidential. *See* Tex. Occ. Code Ann. § 159.002 (West Supp. 2017); *see also* Standards for Privacy of Individually Identi[]fiable Health Information, 65 Fed. Reg. 82462-01 (Dec. 28, 2000) (codified at 45 C.F.R. pts. 160 & 164) (rules implementing the privacy provisions of the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191). This confidentiality requirement puts A.E., her parents, and any potential doctor for A.E. in an untenable position because A.E. cannot meaningfully consent to disclosing her medical information to her parents, but if her parents do not have that information, they can neither make medical decisions regarding her care nor help her make such decisions (even assuming she had the capacity to make such decisions with assistance, which she does not).

daily activities on her own. And she cannot authorize another to do any of those activities on her behalf.

Likewise, supported decision-making cannot serve as an alternative to guardianship for A.E. because she is incapacitated, and she cannot make important life decisions for herself. Even the court investigator, whose report recommended against guardianship, recognized that A.E. does not understand the consequences of her decisions and would not be able to give an opinion on or make a decision about her care situation, about voting, or about her ability to get married. Because supported decision-making calls for giving a person assistance in understanding the person's options but prohibits a supporter from making decisions for the person, the evidence before the probate court established that this alternative is simply not feasible for A.E.

A.E.'s attorney ad litem stated in her report that a full guardianship is necessary for A.E. Amicus Disability Rights Texas asserts that neither the attorney ad litem nor A.E.'s parents mentioned person-centered planning in the hearing, while the court investigator reported to the probate court that person-centered planning was appropriate. But the court investigator merely checked a box on a form indicating person-centered planning was appropriate. Other than this "checked box," there is no testimony or documentary evidence showing that person-centered planning could substitute for a guardianship in this case.[12]

_____

[12]For example, Disability Rights Texas quotes the Administrative Code provisions addressing Texas's Medicaid-waiver program to say that person-

Because clear and convincing evidence established that alternatives that would avoid the need for a guardianship have been considered and are not feasible for A.E. and there was no evidence to the contrary, the probate court abused its discretion by finding the contrary. *See* Tex. Est. Code Ann. § 1101.101(a)(1)(E). We sustain H.E. and P.E.'s fourth issue.

**D.    The Evidence Showed that A.E. Needs a Guardian to Protect Her Rights, and No Evidence Supported a Contrary Finding.**

In their third issue, H.E. and P.E. argue that the probate court abused its discretion by not concluding that A.E.'s rights need to be protected by the appointment of a guardian. *See id.* § 1101.101(a)(1)(C). A.E.'s parents maintain that without a guardian, A.E. is susceptible to abuse and exploitation and will be denied medical care and educational benefits. We agree that clear and convincing evidence established that A.E. needs a guardian to protect her rights.

*First*, a person with an intellectual disability such as A.E. has the right to receive treatment and habilitative services that suit her needs, maximize her capabilities, and enhance her coping abilities. *See* Tex. Health & Safety Code

---

centered planning is a "process that empowers the individual . . . to direct the development of [a plan] that meets the individual's outcomes" and that it "identifies existing supports and services," "identifies natural supports," "occurs with the support of a group of people chosen by the individual," and "accommodates the individual's style of interaction." 40 Tex. Admin. Code § 45.103(78). But the record establishes that A.E. does not have the capacity to direct the development of a plan. And identifying supports and services and natural supports and accommodating A.E.'s style of interaction, while certainly guidelines that guardians should follow, do not take the place of informed consent to medical procedures or educational programs and cannot enable A.E. to understand her options regarding marriage, residency, voting, or driving.

31

Ann. § 592.017 (West 2017).  However, as we have discussed at length herein, A.E. cannot consent to receive medical or psychological treatment and other than a guardianship, there is no legal procedure through which her parents can consent for her to receive non-emergency medical treatment.

Second, A.E. has the right to receive educational services that are appropriate for her needs.  Id. § 592.014 (West 2017); see 20 U.S.C.A. § 1400 (West 2010 & Supp. 2016) (the Individuals with Disabilities Education Act or IDEA).  As H.E. testified at the hearing, because A.E. is now eighteen, A.E.'s rights under the IDEA have been transferred to her.  See Reyes v. Manor I.S.D., 850 F.3d 251, 253 (5th Cir. 2017).  The evidence established that A.E. does not have the capacity to consent to the services or to understand or enforce her rights under the IDEA on her own, nor can she enforce any other rights to educational programs and benefits for which she may be eligible.[13]  The evidence also established that A.E. does not have the ability to consent to her parents making educational decisions for her.  Thus, her parents have no right to

[13]At the time of the hearing, A.E. was a junior in high school.  Her mother testified that "she could be out next year, but she'll probably be in transition until [age] 21."  A student with disabilities is eligible to participate in a school district's special education program through age twenty-one.  Tex. Educ. Code Ann. § 29.003 (West 2012).  The IDEA provides for transition services, "a coordinated set of activities for a child with a disability . . . to facilitate the child's movement from school to post-school activities, . . . [and] includes instruction, related services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation."  20 U.S.C.A. § 1401(34) (West 2010); see 19 Tex. Admin. Code § 75.1023 (Tex. Educ. Agency, Provisions for Individuals Who Are Members of Special Populations).

enforce A.E.'s rights under the IDEA. *See id.* at 253. In fact, the evidence established that A.E. does not have the capacity to consent to or enroll in any other government benefits program under which she may have rights. *See, e.g.*, 40 Tex. Admin. Code § 45.212. A.E. has an IQ between 50 and 55. She does not understand the consequences of her actions, but she likes to please the people around her and tends to agree with whatever is said to her. She could answer "yes" if asked if her parents could sit in at ARD meetings,[14] but she would not understand what was being asked of her and would not understand the significance of consenting to her parents making an educational decision for her.

*Finally,* A.E. has the right to protection from exploitation and abuse because of her intellectual disability. *See* Tex. Health & Safety Code Ann. § 592.012 (West 2017). The evidence establishes, however, that A.E. is vulnerable to exploitation or abuse. The court investigator initially testified that she had no concern that A.E. might be susceptible to abuse or exploitation, but the reasons she gave for her lack of concern was that A.E. lived at home and was "with her parents pretty much everywhere she goes" and that "her parents know that she's involved in special programs in school for people with disabilities." Upon questioning, however, the investigator acknowledged that there would be instances when A.E. was not with her parents. When asked if

---

[14]In Texas, the people responsible for developing a student's individual education program under the IDEA are known as an Admissions, Review, and Dismissal (ARD) committee. *Rockwall I.S.D. v. M.C.*, 816 F.3d 329, 331, n.1 (5th Cir. 2016).

she thus agreed that A.E. could be subject to abuse or exploitation, she agreed it was possible.

A.E.'s mother testified that she "absolutely" believed that A.E. could be subject to exploitation if she had no guardian. A.E.'s doctor stated in her certificate that A.E. is totally without capacity to care for herself and stated in her affidavit that she believed A.E. was susceptible to abuse and exploitation. The court investigator also recognized that A.E. cannot make decisions on her own. And the attorney ad litem did not believe that any less restrictive means would be better for A.E. than guardianship.

Because clear and convincing evidence established that A.E. needs a guardian to protect her rights, and there was no evidence to the contrary, the probate court abused its discretion by finding otherwise. *See* Tex. Est. Code Ann. § 1101.101(a)(1)(C). We sustain H.E. and P.E.'s third issue.

**E.    The Evidence Showed that It Is in A.E.'s Best Interest to Have Her Parents as Guardians, and No Evidence Supported a Contrary Finding.**

In their second issue, H.E. and P.E. argue that the probate court abused its discretion by not finding it is in A.E.'s best interest to appoint her a guardian. *See id.* § 1101.101(a)(1)(B). In their sixth issue, they contend that the probate court abused its discretion in not finding H.E. and P.E. are eligible to act as guardians and are entitled to be appointed. *See id.* § 1101.101(a)(2)(B).

As already discussed above, A.E. is unable to take care of her daily life activities without assistance and would be unable to safely make decisions that

34

would affect her finances, residence, or medical affairs. She cannot dispense her own medications and does not know what they are; does not know who her doctor is and could not schedule her own doctor's appointments; and cannot understand the doctor's advice, even if explained to her. She cannot consent to or take advantage of governmental programs and benefits, including education programs and benefits, yet by law her parents do not have the authority to consent for her. The evidence established that it is in A.E.'s best interest for a guardian to be appointed so that she can continue to receive regular medical care and to take advantage of government programs and benefits for which she is eligible.

The evidence further established that H.E. and P.E. should be the guardians appointed for A.E. By statute, A.E.'s parents are entitled to the appointment. *See id.* § 1104.102 (West 2014) (providing that if an incapacitated adult does not have an eligible spouse who can serve as guardian, the nearest of kin to the incapacitated person is entitled to the guardianship if the person is eligible). A.E.'s parents are not disqualified from the appointment. *See id.* §§ 1104.351–.353 (West 2014) (disqualifying from appointment a person who is incapable of managing the person or is unsuitable or whose conduct is "notoriously bad"), § 1104.354 (West 2014) (disqualifying a person with certain specified conflicts of interest), § 1104.358 (West 2014) (disqualifying a person who has committed family violence and is subject to a protective order protecting

35

the proposed ward). A.E.'s attorney ad litem agreed that her parents are not disqualified.

The evidence overwhelmingly shows that it is in A.E.'s best interest for H.E. and P.E. to be the guardians that are appointed. *See id.* § 1104.001 (West 2014), § 1104.002 (West Supp. 2017) (providing that in appointing a guardian, the court must make a reasonable effort to consider the incapacitated person's preference of guardian and must consider the incapacitated person's best interest). The doctor's certificate stated that the best place for A.E. to reside is with her parents. The court investigator testified that A.E. is close with her parents and that "they have a really good relationship." And while the investigator's report stated that A.E. does not understand guardianship, the attorney ad litem told the court that after talking to A.E., A.E. "was able to tell [the ad litem] that she thinks she likes [her parents'] help, she wants the help to continue." At the end of the hearing, the probate court commended A.E.'s parents "for taking care of [A.E.] so well," and in its findings of fact and conclusions of law, the court found that A.E. is being well taken care of by her parents.

This court is fully cognizant that the statutory requirements rightly give courts a duty to exercise care and caution before removing a person's most sacred rights through a guardianship proceeding and to grant a full guardianship as a last resort in cases in which other options will not suffice to protect the proposed ward. We recognize that the probate court here correctly took its

36

statutory duty seriously. Nevertheless, in this case, the evidence in favor of a guardianship of A.E. was clear and convincing, and the probate court had no evidence that lesser alternatives would protect A.E. and be in her best interest.

Because clear and convincing evidence established that (1) A.E.'s parents are eligible to act as A.E.'s guardians and are entitled to the appointment[15] and (2) it is in A.E.'s best interest for her parents to be appointed as her guardians of the person and no evidence supported contrary findings, the probate court's failure to appoint H.E. and P.E. as guardians was an abuse of discretion. *See id.* § 1101.101(a)(1)(B), (a)(2)(B). We sustain H.E. and P.E.'s second and sixth issues.

Because our holdings on the above issues are dispositive, we do not reach H.E. and P.E.'s remaining issues. *See* Tex. R. App. P. 47.1.

## CONCLUSION

We have reviewed the evidence in the light most favorable to the probate court's decision. Even under this deferential standard, clear and convincing evidence established as a matter of law that (1) A.E. is totally incapacitated because of a mental condition; (2) A.E. does not have the capacity to operate a motor vehicle, make personal decisions regarding residence, and vote in a public election; (3) supports and services and alternatives that would avoid the need for

---

[15]Though the evidence on this point is clear and convincing, such a finding requires only a preponderance of the evidence. Tex. Est. Code Ann. § 1101.101(a)(2)(B).

guardianship are not feasible; (4) it is in A.E.'s best interest to have the probate court appoint H.E. and P.E.—who are eligible to act as A.E.'s guardians and are entitled to appointment—as guardians of A.E.'s person; and (5) A.E.'s rights will be protected by the appointment of a guardian. No evidence supported the probate court's findings to the contrary. We therefore hold that the probate court abused its discretion in denying H.E. and P.E.'s guardianship application. *See Ford Motor Co.*, 363 S.W.3d at 578.

Having sustained H.E. and P.E.'s first, second, third, fourth, fifth, sixth, and seventh issues, we reverse the probate court's denial of H.E. and P.E.'s guardianship application. We remand this case to the probate court for that court to render an order consistent with this opinion and with Texas Estates Code section 1101.151. *See* Tex. Est. Code Ann. § 1101.151 (West Supp. 2017).

/s/ Mark T. Pittman
MARK T. PITTMAN
JUSTICE

PANEL: GABRIEL, PITTMAN, and BIRDWELL, JJ.

DELIVERED: June 14, 2018