

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-19-00104-CV

**IN RE GUARDIANSHIP OF CHARLES INNESS THRASH**, an Incapacitated Person

From the Probate Court No. 1, Bexar County, Texas
Trial Court No. 2017PC2912
Honorable Tom Rickhoff, Judge Presiding

Opinion by: Beth Watkins, Justice

Sitting: Patricia O. Alvarez, Justice
Irene Rios, Justice
Beth Watkins, Justice

Delivered and Filed: December 4, 2019

DISMISSED FOR WANT OF JURISDICTION IN PART; AFFIRMED IN PART

Appellants Laura and Brittany Martinez appeal the probate court's order finding Charles

Inness Thrash incapacitated and appointing permanent guardians over his person and estate. They

raise seven issues challenging the legal and factual sufficiency of that order and request an

immediate stay of the underlying proceedings pending final resolution of this appeal. We dismiss

this appeal as to Brittany for want of jurisdiction, affirm the probate court's order, and deny

appellants' request for a stay as moot.

<strong>BACKGROUND</strong>

Thrash is a millionaire and owner of a successful automotive repair shop. He started dating

Laura around 2009, and by 2012, she moved into the apartment above his shop with him. Over

time, friends and family members grew concerned that Laura was isolating Thrash from them and

spending large amounts of his money. In 2016, Thrash and Laura—as well as two of Laura's adult children, Jose and Michelle—moved into a home Thrash bought for approximately $750,000 in cash. According to several long-time friends, Thrash's purchase of the home was highly unusual because Thrash was known as a fiscally conservative person. They grew suspicious of Laura, who did not allow Thrash to have his own phone, forcing all social and business calls to go to her cell phone.

In 2017, a guardianship specialist for the Texas Health and Human Services Commission ("the HHSC") initiated guardianship proceedings after receiving an anonymous report that Laura was mishandling Thrash's assets. The application for appointment of temporary and permanent guardian alleged Thrash, who was seventy-nine years old at the time, suffered from Alzheimer's disease, was diabetic, and needed daily insulin. The application further alleged that under Laura's influence, Thrash recently changed his will to list Laura and members of her family as beneficiaries, executed a statutory durable power of attorney in Laura's favor, and revised his business plan to name Laura as the successor-owner of his shop.

The application was supported by a report from Dr. Michael Garcia, a neuropsychologist, who opined Thrash showed signs of degenerative dementia and was unable to handle his personal and financial affairs without assistance. Also attached were affidavits from the guardianship specialist who initiated the proceedings and an Adult Protective Services (APS) supervisor who investigated the anonymous report. In her affidavit, the guardianship specialist testified she spoke with members of Thrash's family and some of his long-time friends, who reported Laura kept Thrash away from them and prevented them from having one-on-one conversations with him. She also indicated Laura kept a "black list" of individuals she did not allow Thrash to interact with, including business associates Thrash had worked with and his long-time attorney, Henry

Christopher. Additionally, the APS supervisor testified Frost Bank branch employees saw Laura coaching Thrash at the bank numerous times.

At the temporary guardianship hearing, the probate court, the Honorable Tom Rickhoff presiding, reviewed the affidavits, the court investigator's report, and Dr. Garcia's medical report. The court investigator reported that Thrash had diabetes, Parkinson's disease, hypertension, and Alzheimer's disease—all of which required daily medication that Laura administered. The investigator also reported that Thrash's spending habits had changed significantly since his relationship with Laura began. A review of his bank records showed that he spent large sums of money in 2016 and that he transferred a great deal of money from Frost Bank—where he had banked for more than forty years—to Bank of America.

The investigator also reported that Laura told her she had been in a romantic relationship with Thrash for eight years and that she did not mishandle his assets. Laura told her Thrash made mortgage payments on the home she owned when they started dating and she planned to pay him back when she sold her home. Laura also told the investigator that Thrash had opened an account at Bank of America because friends told them Frost Bank was not a good bank. When asked why Thrash did not have a cell phone, Laura indicated Thrash constantly lost it.

The investigator also reported she met privately with Thrash, who wanted to know who started the guardianship. Thrash told her that he could handle his own money and did not need a guardian. He stated he put Laura on his Bank of America account and wanted her to handle all the bills. When asked about the purchase of the new home, he indicated the home cost $230,000, and did not believe it was approximately $750,000. However, later that day, he called to say he had made a mistake about the price of the home. Thrash told the investigator he lent Laura $50,000, which she would pay back after she sold her home. Thrash also indicated he did not know how much money Laura was spending.

In his medical report, Dr. Garcia noted Thrash's medical history included diabetes, Parkinson's disease, and hypertension. The report indicated that Dr. Garcia conducted a clinical interview of Thrash and that at Thrash's request, Laura was present. During the interview, Dr. Garcia asked Thrash what tasks he could perform, and he answered he could complete daily living activities without assistance but relied on Laura for instrumental tasks like cooking, cleaning, shopping, finances, and outside work. Dr. Garcia reported that Thrash scored "moderately to severely impaired" on the dementia rating scale test, his verbal reasoning abilities were "borderline," and his perceptual-organizational abilities were "mildly impaired." Dr. Garcia opined that Thrash understood most task directions with repetition but was unable to comprehend complex tasks without assistance. Based on the clinical interview and dementia rating test, Dr. Garcia concluded Thrash met the criteria for dementia. He noted that Thrash exhibited "a degenerative dementia of the Alzheimer's type" and his neurocognitive capacities warranted legal intervention.

The probate court also heard testimony from Sandy Sullivan, the senior vice president in charge of fraud management for Frost Bank. She testified employees at Thrash's Frost Bank branch location brought his accounts to her attention after they noticed some unusual transactions. She reviewed the account activity and noted that beginning in 2016, Thrash started using his money market account to pay business expenses—expenses previously paid with his business account. She stated his money market account drastically depleted, shrinking from more than $300,000 to approximately $107,000 in three months. It was unclear whether Thrash was aware of how Laura was managing that account because Laura was filling out all of his bank paperwork. Sullivan testified that Laura had also presented the bank with a power of attorney asking to be added to Thrash's accounts, but the bank refused to honor it because Thrash had previously told branch

employees he did not want Laura added to any of his accounts. Sullivan also testified that by 2017, Frost Bank stopped paying submitted invoices.

Finally, the probate court heard from Ben Wallis, Thrash's ad litem, who had recently met with Thrash. Wallis reported that during this meeting, Thrash was "very aware and conscientious" and actively participated in the conversation. Wallis told the court that Thrash would consent to a temporary guardianship so someone could review the matter. The court ultimately found there was substantial evidence that Thrash lacked capacity and appointed attorney Tom Bassler the temporary guardian of Thrash's person and estate.

Over the next year, Bassler provided the probate court with updates regarding Thrash's health and estate. The probate court also heard testimony from Thrash, who indicated he wanted to live with Laura and did not need anyone intruding on his life. By November 2, 2017, Tonya Barina, Thrash's great-niece, filed an application to be appointed permanent guardian of Thrash's person and estate. Laura filed a response, arguing a permanent guardianship was unnecessary because a less restrictive means—the power of attorney—was available. Laura asked the court to appoint her guardian if it determined such appointment was necessary.

In May and July of 2018, the probate court held hearings on Barina's application and heard testimony from attorney Robert Augsburger—who prepared Thrash's recent power of attorney and will—Laura, Thrash, Bassler, Barina, and some of Thrash's family members. The probate court also had before it the court investigator's report, two medical reports, transcripts from the temporary guardianship and status hearings, and the affidavit from the guardianship specialist.

On November 15, 2018, the probate court signed an order appointing Laura guardian of Thrash's person and Barina guardian of Thrash's estate. The probate court also awarded attorney's fees to be paid from Thrash's estate to Thrash's attorney ad litem, Barina's attorney, and Laura's attorney.

Barina and Laura filed competing motions for new trial, and attorney Philip Ross, purportedly retained by Thrash, filed a response arguing the permanent guardianships were unnecessary, counter-productive, and contrary to Thrash's best interest. On behalf of Thrash and Laura, Ross also filed a response supporting Laura's motion for new trial. On January 29, 2019, the probate court, the Honorable Oscar Kazen presiding,[1] held a hearing on the motions for new trial. At the hearing, attorney Enacio Barretto appeared on behalf of Laura, and Ross purported to appear on behalf of Thrash. Because Thrash had already been found to lack capacity to contract, the probate court treated Ross as Barretto's co-counsel. On January 29, 2019, the probate court signed two orders: one denying Laura's motion for new trial and another granting Barina's motion for new trial and appointing Barina guardian of Thrash's estate and Mary C. Werner guardian of Thrash's person.

The next month, Laura and her adult daughter Brittany began filing pleadings with the probate court as "persons interested in [Thrash]," seeking a temporary injunction to preserve the status quo and to remove Barina and Werner as Thrash's guardians. These filings were Brittany's first appearance in this case. On February 15, 2019, Laura and Brittany filed this appeal.

## ANALYSIS

### *Standing*

Before addressing the appellants' sufficiency arguments, we must determine whether Brittany has standing to appeal. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443–44 (Tex. 1993) (considering jurisdictional matter of standing before merits of case). Barina argues Brittany lacks appellate standing because she did not participate in the underlying

---

[1] The Honorable Tom Rickhoff, who signed the November 15, 2018 order, retired on December 31, 2018, and the Honorable Veronica Vasquez succeeded him. After the Honorable Veronica Vasquez recused herself, the case was heard by the Honorable Oscar Kazen sitting in Probate Court No. 1.

proceedings until after the challenged order was signed, and never filed a motion to intervene as an interested person under section 1055.003 of the Texas Estates Code ("the Code"). Appellants contend, however, that Brittany has standing to appeal because she is a person interested in Thrash's welfare.

### *Standard of Review and Applicable Law*

Standing is a component of subject-matter jurisdiction. *State v. Naylor*, 466 S.W.3d 783, 787 (Tex. 2015). It must exist at every stage of a legal proceeding, including appeal. *Williams v. Lara*, 52 S.W.3d 171, 184 (Tex. 2001). Appellate standing is typically afforded "only to parties of record." *Naylor*, 466 S.W.3d at 787 (internal quotations omitted). We lack jurisdiction over an appeal filed by someone other than a party of record. *Id*. We resolve questions of standing and jurisdiction under a de novo review. *Id.*

Sections 1055.001 and 1055.003 of the Code outline who may become a party to a guardianship proceeding. Section 1055.001 provides that any person has a right to commence a guardianship proceeding or appear and contest a guardianship proceeding unless that person has an adverse interest. TEX. EST. CODE ANN. § 1055.001. Section 1055.003 further provides that "an interested person may intervene in a guardianship proceeding only by filing a timely motion to intervene that is served on the parties." *Id.* § 1055.003. The Code defines an "interested person" as a "person interested in the welfare of an incapacitated person." *Id.* § 1002.018(2).

### *Application*

Here, Brittany did not file an application to commence a guardianship. *See id.* § 1055.001. Nor did she contest the creation of a guardianship or file a motion to intervene in the underlying proceedings prior to the challenged orders. *See id.* §§ 1055.001, 1055.003. Instead, the first time Brittany attempted to insert herself into the guardianship proceeding was after the November 15, 2018 and January 29, 2019 orders were signed. However, "our common law dictates that a party

may not intervene post-judgment unless the trial court first sets aside the judgment." *Naylor*, 466 S.W.3d at 788.

Appellants argue that Brittany is an "interested person" in Thrash's welfare and therefore has appellate standing. This argument is misplaced because it suggests a person's mere interest in the welfare of a ward is sufficient to establish appellate standing. Whether a person is qualified to intervene in a guardianship proceeding is an issue separate and distinct from whether that person is a party of record with standing to appeal a trial court order. *See In re Guardianship of Gilmer*, No. 04-14-00362-CV, 2015 WL 3616071, at *7 (Tex. App.—San Antonio June 10, 2015, no pet.) (standing analysis is distinct analysis from determining qualification to serve as guardian). Here, Brittany did not intervene and become a party of record until after the probate court signed the orders she challenges on appeal. The probate court never set aside those orders. Because Brittany was not a party of record in the probate court prior to the challenged orders, she lacks appellate standing. *See Naylor*, 466 S.W.3d at 787–89; *Cont'l Cas. Co. v. Huizar*, 740 S.W.2d 429, 430 (Tex. 1987) (holding nonparties who have not properly intervened in trial court generally lack standing to appeal trial court's judgment). We must, therefore, dismiss her appeal for want of jurisdiction.

### *Sufficiency of the Evidence*

Laura argues the evidence is legally and factually insufficient to support the probate court's November 15, 2018 order finding Thrash incapacitated and appointing permanent guardians over Thrash's person and estate. According to Laura, the probate court disregarded uncontroverted evidence that the 2016 powers of attorney were valid and constituted less restrictive alternatives to guardianship. Laura further contends the probate court was motivated by an improper concern regarding the payment of attorney's fees without consideration of Thrash's best interests or rights outlined by the Bill of Rights of Wards.

Barina counters that Laura ignores the overwhelming evidence that she mismanaged Thrash's estate and isolated him from his family and friends. She also argues Laura cannot complain on appeal about the probate court's incapacity finding because she, too, requested such a finding when she filed the application for permanent guardianship.

### *Standard of Review*

We review an order imposing a guardianship for an abuse of discretion. *In re Guardianship of Boatsman*, 266 S.W.3d 80, 88 (Tex. App.—Fort Worth 2008, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007). A trial court also abuses its discretion by ruling without supporting evidence. *Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 578 (Tex. 2012). An abuse of discretion does not occur when the trial court bases its decision on conflicting evidence and some evidence of substantive and probative character supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009).

In guardianship proceedings, legal and factual sufficiency of the evidence are not independent, reversible grounds of error; instead, they are factors to consider in assessing whether there was an abuse of discretion. *In re Guardianship of A.E.*, 552 S.W.3d 873, 877 (Tex. App.—Fort Worth 2018, no pet.). Because a finding of incapacity must be supported by clear and convincing evidence, in a legal sufficiency review, we view the evidence in the light most favorable to the trial court's decision to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. *In re Boatsman*, 266 S.W.3d at 85–86. In the legal sufficiency context, an abuse of discretion does not occur when the court's decision is based on conflicting evidence. *In re A.E.*, 552 S.W.3d at 877.

In addressing a factual sufficiency challenge, we must consider all the evidence in the record—both in support of and contrary to the trial court's findings—to determine whether a fact

finder could reasonably form a firm belief or conviction about the truth of the finding. *In re Boatsman*, 266 S.W.3d at 86. If the disputed evidence is so significant that a factfinder could not have formed a firm belief or conviction in the truth of the trial court's findings, then the evidence is factually insufficient. *Id.* The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *See In re C.H.*, 89 S.W.3d 17, 27–29 (Tex. 2002).

### *Applicable Law*

The Legislature has determined that a court shall appoint a guardian for a person other than a minor according to the circumstances and considering the best interests of the ward. TEX. EST. CODE ANN. § 1104.101. Before appointing a guardian, the court must find by clear and convincing evidence that: (1) the ward is an incapacitated person; (2) it is in the best interest of the ward to have the court appoint a guardian; (3) the rights of the ward or the ward's property will be protected by the appointment of a guardian; and (4) alternatives to guardianship and supports and services available have been considered and determined to be infeasible. *Id.* § 1101.101(a)(1). An "incapacitated person" is defined, in relevant part, as "an adult who, because of a physical or mental condition, is substantially unable to: (A) provide food, clothing, or shelter for himself or herself; (B) to care for the person's own physical health; or (C) manage the person's own financial affairs." *Id.* § 1002.017(2). A determination of incapacity of an adult proposed ward must be evidenced by recurring acts or occurrences within the preceding six-month period, and not by isolated instances of negligence or bad judgment. *Id.* § 1101.102.

### *The Evidence Before the Probate Court at the Permanency Hearings*

1.     Medical Reports—Dr. Garcia and Dr. Faber

The probate court considered two medical reports—one by Dr. Garcia, the neuropyschologist whose report was attached to the application for temporary and permanent

guardianship, and another by Dr. Faber, the psychiatrist appointed to perform a psychiatric capacity examination of Thrash. Like Dr. Garcia, Dr. Faber reported that Thrash had Parkinson's disease, hypertension, dementia, and Alzheimer's disease, the severity of which was moderate. He indicated there was no possibility of improvement in Thrash's condition, and it would be in Thrash's best interest to have his medications administered by a third party. Dr. Faber reported Thrash showed a deficit in both short- and long-term memory functions and could not solve problems, reason logically, grasp abstract principles, interpret idiomatic expressions, or break down complex tasks. He further reported Thrash was unable to make responsible decisions for himself, including decisions on managing a personal bank account, administering his own medications, consenting to medical treatment, or regarding marriage. Dr. Faber concluded Thrash was "totally without capacity to care for himself or to manage his property."

### 2. Augsburger's Testimony

Augsburger—the attorney who prepared estate planning documents for Thrash in June of 2016—testified that he met with Thrash two times. Laura drove Thrash to these appointments but did not sit in the meetings. Augsburger testified that during his private consultations, Thrash indicated he wanted to take care of Laura. At Thrash's request, Augsburger prepared a directive to physicians, a HIPAA authorization, and medical and statutory durable powers of attorney. Augsburger testified that between the two meetings, Laura called him to discuss Thrash's estate plan, but he told Laura that information was confidential. Augsburger did not believe it was improper for Laura to have driven Thrash to these meetings. Augsburger also stated he prepared a will for Thrash, making Laura the sole beneficiary with her children the remainder beneficiaries.

### 3. Laura's Testimony

Laura testified that she has lived with Thrash for six years and they have a happy and caring relationship. She testified that she informally handled Thrash's medical and financial affairs prior

to receiving the powers of attorney. Laura explained that she took Thrash to his doctor appointments, routinely took business calls, and took Thrash to a new attorney for estate planning documents at Thrash's request.

With respect to Thrash's activity at Frost Bank, Laura testified Thrash started selling several of his investment properties and depositing large sums of money into one of his Frost Bank accounts. According to Laura, Thrash was saving money to buy a "gingerbread house"—a house that cost significant money—and expressed interest in speaking to Fidelity Investments to get a better return on his money. Laura also explained that her ex-husband worked at Thrash's automobile shop, and Thrash was helping him become responsible with money. She stated that Thrash "piggybanked" pieces of her ex-husband's paycheck to help him save and pay an IRS debt—the invoice Frost Bank declined to pay. She also explained that some of the credit card invoices paid by the Frost Bank account were to pay contractors who did repairs to the automotive shop.

4.      Testimony from Thrash's Family Members

Iris Brigman is Thrash's sister who lives in Frisco, Texas. She testified that she and other members of Thrash's family were concerned that Laura was controlling Thrash and keeping him from his family. According to Iris, Laura has not dated Thrash for six years. She testified that when Thrash became involved with Laura, it became hard to call Thrash or even visit him at his home.

Linda Gruntorad and Donna Galvanauska are Thrash's step-daughters who testified they maintained a good relationship with Thrash until about 2013 when he became involved with Laura. They met Laura at a family funeral. Each testified Thrash described Laura as a woman he dated who wanted him to help her pay her bills, to marry her, and to change "a lot of things in his life," including his will. Both testified they believed Thrash would not take those actions.

5.      Bassler's Testimony

Bassler testified that once he was appointed temporary guardian of Thrash's estate, he began meeting with Thrash once a week. During this time, Laura continued caring for Thrash's daily needs, and Thrash appeared to be happy and well taken care of by Laura. He reviewed Thrash's finances for the past five years and testified that he did not see any evidence that Laura converted any of Thrash's assets to her own. However, when he reviewed Thrash's business account activity, he noted two large purchases and some unusual payroll activity. First, in 2015, Thrash purchased a $106,000 Corvette that he gave to Laura. Then in 2016, Thrash purchased a house that cost approximately $750,000. He did not take out loans to buy either the Corvette or the house. Additionally, payroll checks to Laura's ex-husband, Laura's stepson, and Brittany—who acted as a pseudo-manager for the automotive business—were paid from the business account. This activity was unusual because prior to 2015, Thrash only paid one employee.

Bassler also testified Brittany lived in the apartment inside Thrash's airplane hangar, but had been taking a reduced salary since moving there. Laura's ex-husband also lived in the apartment above Thrash's automotive repair shop for a short period of time after he was released from prison.

Bassler testified that when he was appointed temporary guardian of Thrash's estate, he put Thrash on a $5,000 monthly allowance and Laura used some of those funds to pay the $2,100 monthly mortgage on her own home. She sold that home in February of 2018 and deposited the proceeds of the sale into one of Thrash's bank accounts. When asked whether this activity was a misuse of funds, Bassler opined he was unsure whether Thrash previously arranged to pay Laura's mortgage. He also testified it was hard to expect Laura not to use part of Thrash's allowance because their lives were so intertwined. With regard to the purchase of the new home, Bassler testified the home was one story and safer for Thrash, especially compared to his previous

apartment, which had metal steps and a single entrance and exit. Bassler testified the home was a real estate investment, particularly when a review of Thrash's finances shows he sold several properties before buying the new home.

### 6. Barina's Testimony

Barina testified she believed a guardianship was necessary to protect Thrash because he was spending such large sums of money and making extreme lifestyle changes. Barina testified that once Laura came into Thrash's life, she was not allowed to visit Thrash, and had not visited Thrash in more than three years. Barina added, however, that if she was appointed as Thrash's guardian, she did not plan to disturb his relationship with Laura. She testified Thrash seemed happy in his home and living with Laura.

### *Application*

Again, though Laura frames her issues as evidentiary sufficiency, legal and factual sufficiency are not independent, reversible grounds of error in guardianship proceedings but are, instead, factors to consider in assessing whether the probate court abused its discretion. *In re A.E.*, 552 S.W.3d at 877. With this in mind, we turn to the probate court's November 15, 2018 order. In that order, the probate court made the following findings:

1. Thrash is incapacitated;

2. Thrash's incapacity is evidenced by recurring acts or occurrences within the preceding six-month period and not isolated instances of negligence or bad judgment;

3. Alternatives to guardianship are infeasible;

4. Supports and services available to Thrash are infeasible;

5. Thrash's rights should be fully limited; and

6. It is in Thrash's best interest to have guardians with full powers and authority over Thrash.

*See* TEX. EST. CODE. ANN. § 1101.101.

Here, the evidence shows that Thrash suffered from degenerative dementia and Alzheimer's disease—conditions that cause the loss of cognitive function—with no signs of improvement. At the evidentiary hearings, the probate court considered two medical reports, both concluding that Thrash lacked capacity. The reports indicated Thrash required daily assistance with all his needs, including financial needs, because he could not comprehend complex matters.

The record further reflects Thrash's spending patterns and use of his money market account changed significantly in 2016. That year, Thrash purchased a home valued at approximately $750,000 after living in a modest apartment located above his automotive repair shop for several years. According to the court investigator, Thrash believed the home he bought only cost $230,000. Testimony provided by Sullivan and Bassler reveals that Thrash began making large, uncharacteristic purchases and paying credit card invoices and unusual business expenses out of his money market account as early as 2015. The record also contains evidence that Laura's family members started appearing on the payroll that year, Thrash paid for an IRS debt incurred by Laura's ex-husband, and he loaned Laura $50,000. The probate court also heard evidence that Laura always accompanied Thrash to his bank branch, filled out all his bank paperwork, and did not allow Thrash to speak to any bank employees. Sullivan testified that bank employees did not believe Thrash understood the financial paperwork Laura had him sign. There was also evidence that Laura continued to mismanage Thrash's finances after the probate court appointed Bassler as Thrash's temporary guardian of his estate—the record reflects that Laura used $2,100 of the $5,000 monthly allowance Bassler provided Thrash to pay the mortgage on her own home until it sold in February of 2018.

In addition to Thrash's unusual financial activity, the record contains evidence that Laura isolated Thrash from his friends and family members. Specifically, the court investigator reported Laura maintained a "black list" of individuals with whom Thrash had long-standing relationships

who she prevented from talking to Thrash. The evidence also shows Thrash did not have a cell phone, and all phone calls went through Laura. Family members as well as business associates confirmed they could not speak to Thrash privately. Thrash's step-daughters also testified Thrash told them Laura wanted to marry Thrash and control his finances.

Laura's arguments—that the probate court abused its discretion by not considering the powers of attorney prepared by Augsburger, Thrash's best interests, or the rights outlined by the Bill of Rights of Wards—focus on the evidence favorable to her and ignore the conflicting evidence that she abused the powers Thrash granted her by mismanaging his accounts and isolating him from friends and family. *See In re A.E.*, 552 S.W.3d at 877 (abuse of discretion does not occur when court's decision based on conflicting evidence). Viewing the evidence presented at trial as we must, we conclude a rational trier of fact could have found by clear and convincing evidence each of the findings in the probate court's orders, including that Thrash was incapacitated and that less restrictive alternatives to guardianship were infeasible. *See* TEX. EST. CODE. § 1101.101; *In re A.E.*, 552 S.W.3d at 877; *In re Boatsman*, 266 S.W.3d at 86. We therefore hold the evidence is legally sufficient to support the probate court's order. *See In re A.E.*, 522 S.W.3d at 877; *In re Boatsman*, 266 S.W.3d at 86.

Turning to Laura's factual sufficiency challenge, the probate court heard testimony from both Laura and Thrash that Thrash was happy with Laura. Laura specifically testified that Thrash wanted her to manage his finances and approved her actions. As the exclusive judge of the credibility of the witnesses, the probate court, however, could have disregarded this testimony. *See In re C.H.*, 89 S.W.3d at 27–29. Moreover, Laura did not produce any medical evidence controverting the medical reports concluding Thrash lacked capacity. Contrary to Laura's argument, the probate court was in the best position to observe the credibility and demeanor of the witnesses and to determine that a finding of incapacity was in Thrash's best interest. *See id.* We

therefore conclude the probate court could have reasonably formed a firm belief about the truth of the allegations in the application for appointment of a guardian. *See id.* We therefore hold the evidence is factually sufficient and overrule Laura's sufficiency challenge to the November 15, 2018 order. *See id.*

### *Motion for New Trial*

Laura also argues that the probate court erred in denying her motion for new trial, which challenged the sufficiency of the November 15, 2018 order. A review of the record reflects that after considering the evidence produced at the permanency hearings, the probate court denied Laura's motion for new trial and granted Barina's motion for new trial—which repeated the findings from the November 15, 2018 order, appointed Barina guardian of Thrash's estate, and appointed Werner guardian of Thrash's person. Having determined that the evidence is legally and factually sufficient to support the probate court's November 15, 2018 order, we also conclude the probate court did not abuse its discretion in denying Laura's motion for new trial with respect to her sufficiency complaints. *See Manjlai v. Manjlai*, 447 S.W.3d 376, 379 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (applying sufficiency standard of review to review of motion for new trial challenging sufficiency).

Turning to Laura's last argument challenging the probate court's January 29, 2019 order appointing Werner guardian of Thrash's person, Laura argues the probate court abused its discretion because Thrash preferred her and there is no evidence she breached her fiduciary duty after she was appointed guardian of Thrash's person. In response, Barina argues the probate court did not abuse its discretion by replacing Laura as guardian of Thrash's person because Laura was statutorily ineligible to serve as his guardian.

### *Standard of Review*

"We review a trial court's ruling on a motion for new trial under an abuse of discretion." *Rodriguez v. United Van Lines, Inc.*, 21 S.W.3d 382, 382 (Tex. App.—San Antonio 2000, pet. denied). "A trial court abuses its discretion when it acts 'unreasonably or without regard to any guiding principles.'" *Id.*

### *Applicable Law*

The Code contains several provisions outlining who may be appointed a guardian and why a guardian may be removed. Section 1104.102 provides that when two or more eligible people are equally entitled to be appointed guardian of an incapacitated person, the court should give preference to the incapacitated person's spouse or a nearest of kin. TEX. EST. CODE. ANN. § 1104.102. Section 1104.354 also provides that a person may not be appointed as a guardian if that person is indebted to the proposed ward. *Id.* § 1104.354. Additionally, section 1203.051 authorizes the court, on its own motion or on the motion of an interested person, to remove a guardian who was previously appointed if such power is being abused. *Id.* § 1203.051.

### *Application*

At the motion for new trial hearing, the probate court had before it the court investigator's report, which showed Laura owed Thrash money and was mishandling Thrash's finances. The probate court also considered Sullivan's opinion that Laura mishandled Thrash's money market account and Bassler's testimony that Laura was using Thrash's allowance to pay her mortgage during the pendency of the guardianship proceeding. Based on this evidence, the probate court concluded Laura was indebted to Thrash, so "never should have been appointed the guardian of [Thrash's] person in the first place." We conclude the probate court did not abuse its discretion in declining to appoint as guardian of Thrash's person someone who was not qualified to serve. Accordingly, we overrule Laura's final sufficiency challenge.

***Stay of Underlying Proceedings***

Finally, Laura requests we stay the underlying proceeding during the pendency of this appeal. She contends a stay is necessary to prevent imminent danger of irreparable harm and injury to Thrash. Having determined the probate court did not abuse its discretion in either of its November 15, 2018 and January 29, 2019 orders, we conclude Laura's request for a stay is moot. *See Heckman v. Williamson County*, 369 S.W.3d 137, 162 (Tex. 2012) ("Put simply, a case is moot when the court's action on the merits cannot affect the parties' rights or interests."); *See In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737 (Tex. 2005) ("A case becomes moot if a controversy ceases to exist between the parties at any stage of the legal proceedings . . .").

## CONCLUSION

Based on the foregoing, we dismiss this appeal as to Brittany for want of jurisdiction, affirm the probate court's order, and deny appellants' request for a stay as moot.

Beth Watkins, Justice