

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00373-CV

_____

IN THE GUARDIANSHIP OF SUPRENA LAW, AN INCAPACITATED PERSON

On Appeal from Probate Court No. 2
Tarrant County, Texas
Trial Court No. 2005-0000619-2

Before Kerr, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

Appellant Audrelyn Law (Law) appeals the probate court's order removing her as guardian of the person of her adult daughter Suprena Law (the ward). Law argues in two issues that insufficient evidence supports the removal order and that she was denied due process because after the trial was continued, she did not receive notice of the second hearing date. Because the record does not support Law's arguments, we will affirm.

### Background

In 2005, the probate court found that the then-twenty-three-year-old ward was incapacitated, and it appointed Law as guardian of the ward's person.

In 2020, Law's other daughter, Audrelyn Grace, applied for removal of Law as the ward's guardian and to be appointed as successor guardian. In December 2022, the ward's father filed an application for access to the ward. The record indicates that after serving the parties, Grace took no action in the case until January 2023, when she filed an application for visitation and access to the ward. The court appointed Elizabeth Hart as court visitor, and Hart filed a report concluding that "[n]o substantial evidence exists that indicates phone contact and scheduled visits with [the ward's father and Grace] are not warranted." After a February 2023 hearing, the probate court dismissed Grace's removal application for want of prosecution. However, at the hearing, the probate court ordered Law to allow Grace and the

ward's father[1] to have access to the ward.[2] *See* Tex. Est. Code Ann. § 1053.103 (providing that a court in a guardianship proceeding "shall render a decision, order, decree, or judgment . . . in open court").

In October 2023, Grace filed a new application for Law's removal. She alleged, among other grounds, that Law had disobeyed the probate court's February 2023 order to allow visitation.

That same month, Law's attorney moved to withdraw as counsel. The attorney alleged that he was "unable effectively to communicate with [Law] in a manner consistent with good attorney–client relations. Specifically, the [attorney] ha[d] been unable to reach her by phone or email, . . . in addition to other issues concerning [their] representation agreement[,] which ma[d]e continued representation of Ms. Law untenable."

In November 2023, the probate court again appointed Hart as court visitor. In February 2024, Hart filed a court-visitor report discussing, among other topics, the ward's expressing to Hart a desire to see Grace and Law's prohibiting communication between the ward and Grace despite the probate court's February 2023 order.

---

[1]Law and the ward's father are divorced.

[2]The record does not contain any written order to that effect, but at the April 18, 2024 trial in this case, the probate court and the parties acknowledged that the court had rendered such an order at the February 2023 hearing.

Regarding the ward's desires, Hart noted that she had received contradictory information:

- An Adult Protective Services (APS)[3] investigator, Grace's therapist, and staff at the ward's day program[4] all said that the ward did not want to have any visitation with Grace and her father.

- But the ward had told the probate court at the February 2023 hearing that she wanted to visit with and communicate with her father and Grace.

- Moreover, the ward told Hart that she wanted to have visits with Grace and live with her, and the ward was angry that Law was not allowing her

---

[3] *See* 26 Tex. Admin Code § 711.1; *see also* 40 Tex. Admin. Code § 705.101.

[4] The record contains undefined references to "day program," "day hab," "HCS," and "ISS." These terms referred to services provided under a Texas Medicaid program. Under federal law, a state may obtain a waiver of Medicaid rules to allow the state to provide home- and community-based services to individuals who would otherwise need to receive care in an institutional setting. 42 U.S.C.A. § 1396n(c); *see* Home and Community-based Services Handbook § 1200 (June 1, 2010), https://www.hhs.texas.gov/handbooks/home-community-based-services-handbook. Texas developed its Home and Community-based Services (HCS) "to waive the requirements of intermediate care facilities for individuals with an intellectual disability or related conditions (ICF/IID) services." Home and Community-based Services Handbook, *supra* at § 1200. Under Texas's program, the phrase "day habilitation" refers to "assistance with acquiring, retaining, or improving self-help, socialization, and adaptive skills provided in a location other than the residence of an individual." 26 Tex. Admin. Code § 263.5(10). "ISS" stands for "individualized skills and socialization" and was adopted in Texas to provide similar services. *See id.* §§ 263.2005 (describing services), 263.2019 (discontinuing day habilitation); https://www.hhs.texas.gov/providers/long-term-care-providers/long-term-care-provider-resources/home-community-based-services-hcbs (last visited June 6, 2025) (noting that the Texas Health and Human Services Commission had determined that day habilitation services did not meet requirements and that therefore HHSC would "replace day habilitation with a new service called individualized skills and socialization in the Home and Community-based Services (HCS) . . . waiver program[ ]").

4

to speak with or see Grace. The ward also told Hart that she was "tired of the drama with [Law]."

After Hart's November 1, 2023 appointment, she was not able to meet with Law and the ward until over a month later, on December 11. At that meeting, Law told Hart that until recently, she had not been allowing contact between the ward and Grace because APS had advised her to not allow it. Hart's report asserted that Law's claim was without support:

- APS's involvement arose from a March 2023 allegation that Grace had punched the ward in the stomach.

- Hart reviewed the APS records, and her report noted that the ward had denied this allegation to APS.[5]

- Hart further noted that the APS records contained no indication that APS had told Law to prevent visits or phone calls between the ward and Grace.

Hart's report also included comments about her difficulty in communicating with Law. She stated that her December 2023 meeting with the ward and Law had been at the ward's ISS program rather than at their home "because [she] had not been able to reach [Law] by phone to arrange a visit." She had previously had difficulty contacting Law; Hart noted that after the February 2023 hearing, she and Law's attorney had both made several attempts to reach Law by phone but had been

---

[5]Grace attached to her removal application an April 2023 letter from APS stating that it had investigated a March 15, 2023 allegation and that the investigation had found that she had not punched the ward.

unsuccessful. Hart further asserted that Law's guardian-of-the-person report filed in April 2023 had contained the wrong phone number for Law.

On April 18, 2024, the probate court held a hearing on Grace's application (the April 18 hearing). Three witnesses testified: Grace, Law, and Hart. As she had noted in her February 2024 report, Hart stated that at the February 2023 hearing, the ward had "vocalize[d] her desires to the Court," resulting in the probate court allowing visitation and contact between the ward and her father and Grace. Hart discussed recurring difficulties in getting in touch with Law to arrange visits, and she also provided her opinion that Law should not remain as guardian. She also discussed the allegation against Grace that APS had investigated; because of confidentiality, she did not say who had alleged that Grace had punched the ward in the stomach, but she stated that the ward "didn't make that outcry." At the hearing's conclusion, the probate court took the matter under advisement. The court further stated that it was going to look at the ward's medical records.

On May 30, 2024, the probate court ordered Law, Grace, the ward's father,[6] and Hart to file a verified written status-update report by July 10; the order stated that court would consider the reports in deciding the guardianship issues. Grace and Hart both complied, but Law filed her annual guardian-of-the-person report instead.

---

[6]The father did not file a report.

6

Law's attorney filed an agreed motion to withdraw in June 2024 based on the same allegations in his previous withdrawal motion. The motion to withdraw was set for a hearing on July 18, 2024 (the July 18 hearing). On that date, the probate court signed an "Order Setting Trial Continuance." The order stated that the court had heard the application to remove Law on April 18; that the court had recessed to receive medical records; and that the report that Law had filed in response to the court's May 30 order was not the type of report that the court had requested. The order further stated that "the Application trial" would reconvene on August 2, 2024, at 11:00 a.m., and it ordered Law to bring the ward or ensure her appearance.

At the August 2 hearing, Law was not present. Law's attorney and the probate court discussed Law's absence and the fact that the attorney's office had emailed Law about the hearing date:

> [Law's attorney]: . . . I was not present when the order came in on the 18th . . . . I -- I hope she got notification of this meeting. I have not spoken with her since the 18th.
>
> THE COURT: Is it -- I mean, do you have procedures in place so that if you are not in the office when you receive a court order that it gets to your client?
>
> [Law's attorney]: I would -- I would like to say we do, your Honor. I do know that they have not been effective this week, to -- to my knowledge. . . .
>
> . . . .
>
> In another case, something came into the office [that] should have been scheduled, and I found out that I was scheduled to be in a hearing this week as the hearing went on. So I'm -- I'm just being honest with

7

the Court. I -- I cannot affirmatively say that Ms. Law is aware of this hearing.

THE COURT: When you became aware of this hearing, did you do anything to try and make her aware?

[Law's attorney]: When we became aware of it <u>we sent it to her by e-mail</u>, and I believe -- we said we'll be there because, you know, we're not -- because we -- we've asked not to represent you, but we're -- we've not been let off the case, so we will be there. I don't know that there was any response. I don't know that a phone call was made. I was out with COVID again, on the 18th. So I do not know what procedures were -- took place while -- while I was absent. [Emphasis added.]

THE COURT: Okay.

The probate court then swore in Grace and asked if she had any knowledge about whether Law knew about the hearing; Grace had no direct knowledge but described a conversation with another woman that had led her to believe that Law asked the woman to be at the hearing. The probate court then stated,

Okay. Well, I have read the reports that were filed by Ms. Hart and by Ms. Grace that the Court required to be filed by June 10th, 2024. And, of course, I have read the Guardian of a Person Report, which was filed by Audrelyn Law, which is required by law, she is the current guardian of the person; but that was not the type of report that I had asked. She failed to file any type of report that I had ordered.

I have previously spoken to [the ward] prior to this trial in other hearings regarding this matter. And so I am -- I'm going to make my ruling without speaking to [the ward]. I am going to remove Audrelyn Law as guardian of the person, and I am going to find that Audrelyn Grace, you are a qualified person to be successor guardian of [the ward].

Later that day, Law's attorney sent an email to the probate court and the other parties' attorneys confirming that, on July 19, his office had emailed Law the order

8

setting the hearing for August 2. The email address to which he had sent the notice was the same email address that Law had provided to the court at the April 18 hearing.

The probate court signed an order removing Law as the ward's guardian and appointing Grace as successor guardian of the person.[7] In the removal order, the probate court found that Law had

> 1. "engaged in conduct with respect to the Ward that would be considered to be abuse, neglect, or exploitation, as those terms are defined in Section 48.002, Human Resources Code[8]";

---

[7]The order noted that the probate court had heard the application on April 18, 2024, and it stated that it was "[s]igned this 18th day of July, 2024"—that is, before the August 2 hearing—but it was file stamped August 2, 2024. The signature date appears to be a clerical error, but for our purposes, it does not matter whether the probate court signed the order in July or August because the record reflects that the court did not hear evidence on the merits of the removal application at either the July 18 or the August 2 hearing.

[8]With respect to the court's first finding, under the Texas Human Resources Code, "abuse" means "the negligent or wilful infliction of injury, unreasonable confinement, intimidation, or cruel punishment with resulting physical or emotional harm or pain to . . . [a] person with a disability by the person's caretaker, family member, or other individual who has an ongoing relationship with the person." Tex. Hum. Res. Code Ann. § 48.002(2). "Exploitation" means the illegal or improper act or process of an individual who has an ongoing relationship with a person with a disability "that involves using, or attempting to use, the resources of the . . . person with a disability, including the person's social security number or other identifying information, for monetary or personal benefit, profit, or gain without the informed consent of the person." Id. § 48.002(3). "Neglect" refers to "the failure to provide for one's self the goods or services, including medical services, which are necessary to avoid physical or emotional harm or pain or the failure of a caretaker to provide such goods or services." Id. § 48.002(4).

9

2. "neglected to educate or maintain the ward as liberally as the ward's ability or condition permit"; and

3. "interfered with the ward's progress or participation in programs in the community."

*See id.* § 1203.052(a)(6)–(8).

On August 29, 2024, the probate court granted Law's attorney's motion to withdraw. Law obtained new counsel, who filed a motion for new trial asserting that Law had not received notice of the August 2 hearing and that the lack of notice violated her due-process rights. The motion was overruled by operation of law.

## Discussion

Law raises two issues on appeal and argues them together. Accordingly, we organize our analysis by argument rather than by issue.

## I. Hearing Notice

First, Law argues that her due-process rights under the United States and Texas Constitutions were violated because she was not given notice of the August 2 hearing. She contends that her attorney stated at the August 2 hearing that he did not think that she knew about the hearing and that from her attorney's statements, it was apparent "that there was a serious doubt/issue on whether or not Appellant was notified of the continuation and reset of final trial." She asserts that because she was not aware of the hearing date, she was deprived of the opportunity to be heard, to present witnesses and evidence, and to cross-examine witnesses.

Law also says that the lack of notice of the second hearing date violated "Texas laws," but she does not say which laws or cite them, and we cannot determine from context the laws to which she refers. We hold that this argument is waived as inadequately briefed. *See* Tex. R. App. P. 38.1(i). She also does not cite in her argument section which constitutional provisions were allegedly violated, but the context of her argument makes obvious the provisions to which she refers, and she includes those provisions in her table of authorities. Accordingly, we will address her constitutional arguments.

There is no question raised by Law or the record as to whether Law received notice of the removal petition. *See* Tex. Est. Code Ann. § 1203.052 (setting out grounds for removing a guardian after notification by a qualified delivery method to answer at a time and place set in notice). With respect to notice of the August 2 hearing date, under the Texas Estates Code, when a party is represented by an attorney of record, any notice required to be served on a party must be served on the party's attorney instead of the party. *Id.* § 1051.055(a) ("If a party is represented by an attorney of record in a guardianship proceeding, . . . a citation or notice required to be served on the party shall be served instead on that attorney."); *see also id.* § 1051.056; *Guardianship of Fairley*, 650 S.W.3d 372, 384 (Tex. 2022) (noting that statute governing service of process in guardianship proceedings trumps a conflicting rule of procedure). There is no question raised by Law or the record regarding whether Law's attorney received notice of the August 2 hearing date or whether he appeared at and

11

participated in the hearing. *See* Tex. Est. Code Ann. §§ 1051.055(a), 1051.251. Thus, there is no question about whether the probate court complied with the Estate Code's provision for providing notice of a hearing.

Law's complaint is not that the probate court failed to comply with notice requirements but that her attorney did not inform her of the hearing. Contrary to Law's arguments, her attorney stated at the August 2 hearing that once his office received the hearing notice, it was emailed to Law. There is no evidence in the record that the notice was sent to the wrong email address. To the contrary, the record indicates that the email had been sent to Law's correct email address. Law's verified new-trial motion stated that she "never knowingly waived her appearance for the trial," "never intentionally and knowingly disregarded the [probate court]'s order to appear," and "had no knowledge of the Order Setting Trial Continuation," but the motion did not state that the email from her attorney had never reached her account, and she did not dispute that the email address referenced by her attorney was her correct email address.[9] The address to which the attorney sent the email was the address that Law had confirmed—on the record in open court—was her correct email

_____

[9]Law attached an affidavit to her brief in which she states, with no additional detail, that she did not receive the probate court's order continuing trial to August 2. Because this affidavit was not presented to the probate court, we will not consider it. *See Nsuh v. Ngumashi*, No. 02-24-00189-CV, 2024 WL 4898788, at *4 (Tex. App.—Fort Worth Nov. 27, 2024, no pet.) (mem. op.).

address, and the record contains evidence from multiple witnesses that Law was difficult to reach by phone, as discussed more below.

The only case that Law cites regarding her due-process arguments is *Goldberg v. Kelly*, which holds that when the government terminates public-assistance payments to a particular recipient, the recipient must be provided "timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally." 397 U.S. 254, 267–68, 90 S. Ct. 1011, 1020 (1970). Law does not dispute that she was served with the application to remove her as guardian or that her attorney was provided notice of the August 2 hearing in compliance with the Estates Code. Further, no evidence on the merits was presented at the August 2 hearing; instead, the evidence had already been presented at the April 18 hearing attended by Law, and the parties had made closing arguments on that date. Thus, Law had the opportunity to confront adverse witnesses and present her own evidence and arguments. Additionally, her attorney was present at the August 2 hearing to present argument on her behalf, if the probate court had called for arguments, and to present evidence, had the probate court allowed the parties to offer additional evidence at that time. Moreover, although Law argues that she was deprived of the opportunity to present evidence and confront witnesses, she does not tell us what evidence she would have produced or elicited had she been present when the proceedings continued on August 2. *See* Tex. R. App. P. 38.1; 44.1(a); *Ivey v. Ivey*, No. 05-07-01311-

13

CV, 2009 WL 1299131, at *3 (Tex. App.—Dallas May 12, 2009, pet. denied) (mem. op.) (holding that appellant had not shown harm from failure to receive notice of hearing).

In summary, there is no dispute that Law's attorney was provided with notice of the August 2 hearing as required by the Estates Code; evidence and arguments, including closing arguments, had already been presented to the probate court before the August 2 hearing; no evidence or argument on the merits were presented at the August 2 hearing; Law's attorney stated on the record that he had emailed Law about the August 2 hearing; undisputed evidence in the record established that Law was difficult to reach by phone; and Law has not said what evidence or argument she would have asked her attorney to present had she been present at the August 2 hearing. Further, Law provides no citation for any authority that provides that her attorney was required to follow-up his email with a phone call despite the established difficulties with reaching her by phone.[10] *See* Tex. R. App. P. 38.1(i). Given these specific circumstances, we overrule this part of Law's issues.

Although not entirely clear, Law's brief could be construed to complain that she did not attend the July 18 hearing because her attorney told her that it was not necessary for her to attend. But nothing in the record indicates that any evidence or

---

[10]Nothing in this opinion should be construed as minimizing the duty of all attorneys to keep their clients reasonably informed about the status of matters and to promptly comply with reasonable requests for information. Tex. Disciplinary Rules Prof'l Conduct R. 1.03(a).

arguments regarding the removal application were heard on that date. Rather, that hearing was set on Law's attorney's motion to withdraw.[11] On July 18, the probate court signed its "Order Setting Trial Continuance" noting that the removal application had been heard on April 18; that "[a] record was made, and the [trial c]ourt recessed to receive medical records"; that the probate court had ordered all parties to file a report; that Law did not file the type of report that the probate court had requested; and that "the Application trial will reconvene on August 2, 2024, at 11:00 a.m." Nothing in the record indicates that the July 18 hearing concerned the removal application. Moreover, to the extent she argues that her absence from the hearing prevented her from presenting evidence regarding the removal application, nothing in the record suggests that if she had attended, the probate court would have allowed her or any other party to present evidence related to her removal as guardian.

Further, Law acknowledges that she was aware of the July 18 hearing. Although she says that her attorney told her that she was not *required* to attend, she does not argue (and did not present any evidence in the record) that her attorney told her she should not attend. We overrule the part of Law's issues arguing that her due-process rights were violated by her not attending the July 18 hearing.

---

[11]Based on Law's statements at the August 2 hearing, the probate court apparently denied the withdrawal motion at the July 18 hearing. It subsequently granted the motion on August 5, 2024.

15

## II. The Ward's Absence on August 2

Law also asserts in one sentence in her arguments that the ward had a right to be present at the August 2 hearing. She additionally argues that the ward should have been appointed a guardian ad litem and that the failure to do so or to allow the ward to be heard was not in the ward's best interest.

Regarding the appointment of a guardian ad litem, the probate court could have done so, *see* Tex. Est. Code Ann. § 1054.051, but Law cites no authority that the probate court was required to do so. *See* Tex. R. App. P. 38.1(i). Further, she provides no argument to explain why it was in the ward's best interest for the probate court to have done so in this case, and she points to nowhere in the record where she requested the appointment of a guardian ad litem. *See* Tex. R. App. P. 33.1; 38.1(i).

Regarding the ward's absence from the proceeding and whether the probate court should have spoken to the ward, the record reflects that the probate court had previously spoken to the ward on the matter; that the court visitor's June 2024 status report to the court relayed the conversation she had with the ward that same month in which the ward continued to maintain her wish to live with Grace; and that Law's attorney did not object to the ward's absence at the August 2 hearing. *See* Tex. R. App. 33.1; *In re Guardianship of Simmons*, 479 S.W.3d 364, 368 (Tex. App.—El Paso 2015, no pet.) (holding that because no objection had been made to ward's absence, argument that ward needed to be present at a hearing was not preserved). Further, Law does not explain how her rights were affected by the ward's absence, and she cites no authority

16

to support her argument that the ward's absence from the hearing constitutes reversible error. *See* Tex. R. App. P. 38.1(i). We overrule these parts of Law's issues.

## III. Probate Court's Findings

Citing Texas Estates Code Section 1203.052, Law states that the probate court did not make any findings in open court that Grace had met her burden to prove the allegations for Law's removal or to be appointed successor guardian. *See* Tex. Est. Code Ann. § 1203.052 (providing grounds for removing a guardian with notice). It is unclear whether Law's brief is arguing that the probate court's order must be reversed because the court failed to pronounce its findings in open court. However, to the extent that she makes such an argument, she has not cited any authority for the proposition that the court's failure to announce its findings in open court requires reversal. *See* Tex. R. App. P. 38.1(i).

Further, the record reflects that the probate court complied with statutory requirements. The probate court rendered in open court its decision to remove her and to appoint Grace, and it stated that Grace was qualified to be the ward's successor guardian. *See* Tex. Est. Code Ann. § 1053.103 (requiring trial court to render in open court the court's decision in a guardianship proceeding). Additionally, in the removal order, the court stated the cause for removal. *See id.* § 1203.053 (stating that an order removing a guardian shall state the cause of the removal); *see also In re Guardianship of Finley*, 220 S.W.3d 608, 612 (Tex. App.—Texarkana 2007, no pet.) (noting that trial

court had rendered in open court its decision to remove guardian and had then signed order setting out basis for removal). We overrule this part of Law's issues.

## IV. Evidentiary Sufficiency

Finally, Law challenges the legal sufficiency of the evidence to support her removal.[12]

### A. Standard of Review

Although Law's brief raises a sufficiency challenge, we review a probate court's guardianship determinations for an abuse of discretion.[13] *In re A.E.*, 552 S.W.3d 873, 876 (Tex. App.—Fort Worth 2018, no pet.); *In re Guardianship of Jones*, No. 02-15-00367-CV, 2016 WL 4474353, at *7 (Tex. App.—Fort Worth Aug. 25, 2016, no pet.) (mem. op.). While legal and factual sufficiency of the evidence are relevant factors in

---

[12]This argument falls under the part of Law's first issue in which she asserts that the probate court erred by failing to require that Grace "prove the case under the standard required by law 'clear and convincing evidence' for removal of a guardian under Texas Estates Code §[ ]113.052." But Section 113.052 does not apply to this case. *See* Tex. Est. Code Ann. § 113.052 (discussing uniform account form that may be used by financial institutions).

Law may have meant to say Section 1203.056, which requires clear and convincing evidence when removing a guardian under Section 1203.051(a)(6)(A) or (B). *See id.* §§ 1203.051(a)(6)(A), (B) (allowing removal of a guardian without notice because the guardian cannot be served with notices or other processes because the guardian's whereabouts are unknown or the guardian is eluding service); 1203.056 (requiring clear and convincing evidence to remove guardian under 1203.051(a)(6)(A) or (B)). Law was not removed under any part of Section 1203.051. Instead, as discussed below, she was removed under Section 1203.052.

[13]Law's brief contains a "Standard of Review" section, but it does not contain a standard of review. Instead, it contains a summary of Law's arguments.

18

reviewing whether the trial court abused its discretion, they are not independent, reversible grounds of error. *Jones*, 2016 WL 4474353, at *8; *see also In re Guardianship of Covington*, No. 02-11-00107-CV, 2012 WL 1556186, at *3 (Tex. App.—Fort Worth May 3, 2012, no pet.) (mem. op. on reh'g).

A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620. Further, no abuse of discretion occurs when the trial court decides based on conflicting evidence, so long as some substantive and probative evidence supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002) (op. on reh'g); *see also In re Nitla S.A. de C.V.*, 92 S.W.3d 419, 422 (Tex. 2002) (stating that under abuse of discretion standard, reviewing court may not set aside trial court's finding "unless it is clear from the record that the trial court could only reach one decision"). A trial court does not abuse its discretion if it reaches the right result for the wrong reason. *See In re R.M.*, No. 02-18-00004-CV, 2018 WL 2293285, at *5 (Tex. App.—Fort Worth May 21, 2018, no pet.) (mem. op.); *see also Guardianship of Finley*,

220 S.W.3d at 612; *In re Guardianship of Erickson*, 208 S.W.3d 737, 744 (Tex. App.—Texarkana 2006, no pet.).

Law does not specify whether she challenges the legal or factual sufficiency of the evidence supporting the probate court's decision. However, because she asserts that Grace "offered no evidence, witnesses[,] or testimony" at the August 2 hearing and that Grace "did not present any evidence or testimony to substantiate the removal of" Law as guardian, we consider her brief to challenge the legal sufficiency of the evidence to support the probate court's exercise of discretion. *See Lua v. Capital Plus Fin., LLC*, 646 S.W.3d 622, 631 n.5 (Tex. App.—Dallas 2022, pet. denied).

### B. Statutory Removal Grounds

The Texas Estates Code sets out seven grounds for removing a guardian without notice and eleven grounds for removing a guardian with notice. Tex. Est. Code Ann. §§ 1203.051–.052. Section 1203.052 allows the trial court to remove a guardian on the complaint of an interested person "after the guardian has been cited by personal service to answer at a time and place set in the notice." *Id.* § 1203.052(a-1)(2). There is no dispute in this case that Law was cited by personal service to answer at a time and place set in the notice.

The probate court's removal order included three of the Section 1203.052 removal grounds. *See id.* § 1203.052(a)(6)–(8). In addition to those and other grounds, Section 1203.052 allows a probate court to remove a guardian if the guardian

"fails to obey a proper order of the court that has jurisdiction with respect to the performance of the guardian's duties." *Id.* § 1203.052(a)(3).

### C. The Record Evidence

Law's sufficiency argument turns on the fact that no evidence was introduced or admitted at the August 2 hearing with respect to the removal application and that there is no record of the July 18 hearing on her attorney's motion to withdraw. However, her brief does not address the evidence that was presented to the probate court, and she does not explain why the evidence presented to the court does not support the probate court's exercise of its discretion. *See* Tex. R. App. P. 38.1(i). The closest her brief comes to addressing the evidence is her assertion that the probate court's findings in its removal order "are all inaccurate." Her brief further fails to cite authority supporting her argument that the probate court had insufficient evidence to exercise its discretion to remove her. *See id.*; *Mata v. Argos USA LLC*, No. 06-21-00089-CV, 2022 WL 1193671, at *4 (Tex. App.—Texarkana Apr. 22, 2022, no pet.) (mem. op.) (holding sufficiency argument was waived for inadequate briefing); *see also Fredonia State Bank v. Gen. Am. Life Ins.*, 881 S.W.2d 279, 284 (Tex. 1994) (observing that error may be waived by inadequate briefing). However, to the extent that Law has not waived her argument by inadequate briefing, we nevertheless reject her argument because some evidence supports the probate court's decision.

21

At the April 18 hearing, the probate court heard from three witnesses: Law, Hart, and Grace. The probate court subsequently received the ward's medical records, Hart's and Grace's status reports, and Law's annual guardian-of-the-person report.

The probate court could consider evidence that Law interfered not just with Grace's contact with the ward, but with contact between the ward and the rest of her family:

- Grace stated that she had regularly seen her sister in the past, but at some point, Law began "plac[ing] different roadblocks," including "taking the phone away [from the ward], . . . [and] not answering [Grace's] calls," not answering the door when Grace stopped by, and not allowing her to see the ward on the occasions when Law did answer the door.

- Grace stated that after the February 2023 hearing, she gave her sister a cell phone to use, but her sister's calls stopped in March 2023. Since that time, she had only been able to talk on the phone with or visit her sister around three times. Grace stated that it had been difficult to communicate with her mother about the ward. When she tried to call Law, Law "says [']we're doing something['] or she doesn't answer or she hangs the phone up . . . . [I]t just goes to her voicemail . . . ; or she'll pick up by accident and [Grace would] hear conversations that she's having. And that's pretty much it."

- Hart stated that the ward had also been isolated from extended family members since the death of Law's mother in 2007. Hart's June 2024 status report also discussed information she had learned from other family members about the ward's isolation. Law's sister told Hart that when the ward and Grace were growing up, Law never allowed them to spend time alone with any of the family members; "for instance, [she] never allowed [them] to attend family birthday parties for cousins." They

were only allowed to see relatives if Law's mother was present.[14] The sister stated that she wanted to be part of the ward's support network. Law's other sister made similar statements to Hart.

- Hart's June 2024 status report noted the ward's social network "ha[d] been limited to [the ward]'s mother, staff at the day program[,] and other day-program participants."

The probate court also had evidence that Law made it difficult to contact her, even when the person contacting her was her own attorney or the court visitor:

- Hart testified that there had been a "strong" theme throughout the proceedings "of being unable to get a hold of [Law]."

- Law acknowledged at the April 18 hearing that Hart had experienced difficulty getting in touch with her, but she claimed that it was because she did not have her voicemail set up. However, the record contains testimony that even after Law set up her voicemail, sometimes her voicemail was full, and at other times she did not return calls even when messages were left. For example, Law testified at the April 18 hearing that the ward's father had called her the day before and left her a message, and although "[h]e said it was an emergency," she did not call him back.

- Hart also testified that she had trouble reaching Law even after leaving voicemails. Further, Grace also testified that sometimes Law's voicemail was full. Hart additionally noted in a report that in Law's April 2023 guardian-of-the-person report, she had provided an incorrect phone number for herself.

- Hart further testified that Law's trial attorney had difficulty reaching Law, and the attorney said the same in his motion to withdraw. Difficulties in contacting Law were consistent throughout these proceedings.

---

[14]Law was in the military when the children were young, and when they were under school age, they lived with Law's mother during the time that Law was stationed overseas.

23

Relatedly, the probate court heard evidence that Law had disobeyed the court's order to allow visitation with Grace and had blamed her doing so on APS, even though APS had not prohibited contact:

- Hart was reappointed as court visitor on November 1, 2023. She stated in her February 2024 court visitor report and at the April 18 hearing that in attempting to arrange visitation, she was not able to speak with Law until December 11, 2023. Hart "had not been able to reach [Law] by phone to arrange a visit," so she met Law and the ward at the ward's day program.

- At that time, Law "represented to [Hart] that she had not permitted visitation or communication since the February [2023] hearing." Law claimed that APS had advised her not to permit that communication or visitation. But Hart noted in her February 2024 report that the APS records that she had reviewed contained no indication that APS had ever told Law to prevent visits or phone calls between the ward and Grace.

- At the April 18 hearing, Law acknowledged that she had stopped visitation despite the probate court's February 2023 order and that she did so without informing the court or her attorney of any APS recommendation contradicting the court order. Law further acknowledged that APS "didn't say don't let [the ward] see [Grace and her father]." But she claimed that APS had recommended that she not let Grace see the ward "[b]ecause it upset" the ward.

- Hart further testified that staff at the ward's "day hab" had told her that they had been told that there was a court order in place to not allow visitation, "which there wasn't."

In summary, the probate court had evidence that to keep the ward away from Grace, Law had misrepresented to the ward's day-program staff that a court had ordered no visitation with Grace, had represented to Hart that APS had advised no visitation with Grace when it had not, and had made it difficult for Hart—the person appointed to assess the ward's condition and make recommendations about any

24

needed changes to the guardianship[15]—to contact her. Evidence that Law had been isolating the ward from her family and had continued to do so in contravention of a court order is evidence that supported removing Law as guardian. *See* Tex. Est. Code Ann. § 1203.052(a)(3). Law makes no argument on appeal that the probate court's February 2023 order was not a proper order of the court. *See id.* Law additionally failed to file a status report as the probate court had ordered in May 2024. *See id.*

The probate court also could have considered Law's isolation of the ward as some evidence to satisfy the removal ground in Section 1203.052(a)(7). *See id.* § 1203.052(a)(7) (allowing removal of guardian for neglecting to maintain ward as liberally as ward's ability or condition permits). Additionally, Hart testified that the ward should have "an opportunity to develop her voice more" and develop more independence, which Hart did not believe was "a focus of [Law]." Hart's belief had some support in her testimony about the ward's wishes to see her sister, which Law thwarted:

- Hart stated that at a previous hearing in the guardianship, which had occurred in February 2023, the ward had been present, and she had "vocalize[d] her desires to the [probate c]ourt" before and after the hearing.

- Hart had previously recommended in a report that the ward be placed in a group home, in part because of the ward's "consistency in telling [Hart] that she's having conflict with her mother."

---

[15] *See* Tex. Est. Code Ann. §§ 1054.102, .104 (addressing court visitors).

25

- Hart spoke to the ward in December 2023, and the ward said that she wanted to spend time with her sister and her father and that she was "tired of the drama with momma."

- Hart heard something different from Law and in APS's reports, and Hart noted that the ward had told her therapist that "she didn't want visits with her sister" and "[s]taff at the day hab" had said that the ward "would say she was tired of her sister."

- But the ward "never said those things" to Hart. Hart testified at trial and stated in her reports that the ward consistently told Hart that she wanted to visit with and live with Grace, "and that is what she told [Hart] throughout the whole time [that Hart had] been appointed on this case."

- Hart further observed that under the "Bill of Rights for Wards" in the Estates Code, the ward had the right to have visitation with persons of the ward's choice. *See id.* § 1151.351(b)(3), (5) (providing that, unless restricted by a court or by law, a ward is authorized "to be treated with respect, consideration, and recognition of the ward's dignity and individuality" and "to consideration of the ward's current and previously stated personal preferences, desires, . . . living arrangements, and other preferences and opinions."

Thus, the probate court had some evidence that Law's isolation of the ward was against the ward's wishes. Hart testified that the ward "has the ability to make statements about what she wants" and was "not without [the] capacity to make some decisions for herself," and the probate court had personally spoken to the ward at a prior hearing, and therefore the probate court had some evidence from which the court could determine that the ward had the ability to decide if she wanted to see Grace and to express that desire.

Moreover, when Hart had visited the ward's home, she had found that Law and the ward had been living "in a 608 square foot apartment with a single bedroom, [of

26

which] the accessible . . . living space was probably under 300 square feet," with the other half of the apartment "pretty filled with furniture, collectibles, and was not accessible living space." Hart "found it concerning" that even though the ward was paying half the rent,[16] they lived in such a small, cramped space, even though "[a]ccording to very rough calculations of what the household income [was], there should be enough money to support at least a two[-]bedroom apartment." Law stated at the April 18 hearing that a month before the hearing, she and the ward had moved to a two-bedroom apartment and had only been living in the cramped apartment because they "just had to take [their] time getting something bigger." However, the overcrowded condition of the home had existed at least as early as February 2023, and Law did not provide a reason why she and the ward had not moved sooner or why she had allowed their home to become so cramped. *See In re Keller*, 233 S.W.3d 454, 459–60 (Tex. App.—Waco 2007, pet. denied) (holding that although evidence was not overwhelming, court did not abuse its discretion by removing guardian when the court had some evidence that ward was in a nursing home that failed to adequately provide for ward's grooming needs and was too far away for family and friends to visit, which the court found was not conducive to the ward's mental health).

Aside from concerns about maintaining the ward, Hart also expressed concern about excessive allegations of "bad things" happening to the ward. In Hart's June

---

[16]The ward receives Social Security payments as well as HCS benefits each month.

2024 status report, she recommended that Law be removed as guardian because, among other reasons, "[t]he unprecedented allegations made by [Law] of sexual abuse, assault, and misconduct [against the ward], is an indication that [Law] should not have unsupervised access to [the ward]." Hart had detailed some of those allegations in prior reports and in her June 2024 report. She stated in the June 2024 report that the number of allegations were "unprecedented in [her] 17-year career." She made a similar statement at the April 18 hearing, stating that "how many times that [Law] . . . had reported, and even prior to the guardianship being created, bad things happening to [the ward] [was] at a rate that . . . far exceed[ed] any of the other 1300 cases that [the probate court had] in [its] jurisdiction . . . under guardianship." Hart was concerned "that there would be so many things bad to happen to one person under a guardianship."

Although Grace had testified that Law, "when she gets upset with people[,] . . . likes to say that they committed sexual crimes against people," it is unclear whether Hart believed that Law was repeatedly making false allegations regarding the ward or was consistently failing to protect the ward from abuse or harm.[17] Either situation

_____

[17]The probate court had some evidence that at least some allegations of abuse of the ward were untrue. As noted above, Grace had been accused of punching the ward in the stomach, and the probate court had evidence that Grace had been cleared of that allegation. Law denied making that accusation, but it was raised with APS shortly after the probate court's February 2023 order requiring visitation. Additionally, Hart reviewed the ward's medical records for her June 2024 report, and she noted that in February 2024, Law told the ward's doctor that the ward had shoulder pain because Grace had grabbed the ward by the arm. But the ward told hospital staff something

would provide some evidence to support the probate court's discretion to remove Law under Section 1203.052, especially when combined with evidence that Law was isolating the ward, showed a willingness to violate a court order, and made it difficult for the court visitor to contact her or visit the ward. *See, e.g.*, *Bibby v. Bibby*, 634 S.W.3d 401, 412 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (holding that father of the ward had made a prima facie showing of abuse by guardian, the ward's mother, for making an unsubstantiated allegation of sexual abuse of the ward); *Keller*, 233 S.W.3d at 459–61.

Because the probate court had some evidence from which it could exercise its discretion to remove Law, we overrule the remainder of Law's issues.

---

different—that a day program attendee had grabbed her by the arm the day before. Notes in the medical records from later that same day also stated that the ward had been the "front seat passenger in [a] seat belt involved hit and run rear-end accident earlier in the day." (That was the third instance in the court's records of Law's claiming that her vehicle had suffered a hit-and-run with her and the ward in the vehicle.) Grace reported to Hart that APS had investigated her in February 2024 after another allegation against her for which she had been cleared. It is unclear if the report to APS was based on what Law told the ward's doctor about Grace grabbing the ward's arm or if it was based on a different allegation.

Law had also told medical staff that Grace had taken the ward's clothes to a second-hand store and bought the ward "cheap clothes from the store to wear instead, presumably as a way to get money." Nothing in the record provided any facts to support these allegations. Grace did testify about one time when she took shoes from the ward and gave her a different pair, but Grace explained that she did so because the ward's shoes were too small. There was no testimony or other evidence of Grace's selling the ward's shoes.

29

## Conclusion

Having overruled Law's issues, we affirm the probate court's order.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered:  June 12, 2025